OPINION OF THE COURT
Kaye, J.
Resolution of this proceeding to terminate parental rights for failure over the period of more than a year to plan for the future of a child hinges on whether the agency discharged its statutory obligation to exercise diligent efforts to encourage and strengthen the parental relationship, “a threshold consideration and a necessary prerequisite to any determination of permanent neglect.” (Matter of Sheila G., 61 NY2d 368, 386.) Because we agree with the Appellate Division that the record does not reflect diligent efforts on the part of the agency to aid the parents in remedying the very conditions now urged as the basis of their neglect, we affirm the order below dismissing the petition, with costs.
*391 We note at the outset what is not involved in this proceeding. The child who is at the center of this dispute, Jamie M., has since birth suffered serious physical afflictions requiring extraordinary care. She has indisputably enjoyed a level of care with her foster family — her foster mother is a registered nurse — that her natural parents could not offer. However, no claim is made that, because of the demands of Jamie’s condition, efforts to strengthen parental ties would be detrimental to her best interests (Social Services Law, § 384-b, subd 7, par [a]). Similarly, while the agency complains of missed visits by the parents during the period in issue (Oct. 1978 to Jan. 1981), no claim is made that parental rights should be severed because of a failure to maintain contact (Social Services Law, § 384-b, subd 7, par [a]). Only the parents’ failure to plan for Jamie’s future is charged as the basis for termination.
Born prematurely in September 1977, Jamie has since birth required special care. She spent the initial months of her life in the hospital, where portions of her intestines were removed and a colostomy performed. In the care of her parents thereafter, Jamie had frequent illnesses, including skin rashes from poor hygiene. Five times between January and September 1978 she was hospitalized for pneumonia. In September 1978, at the suggestion of the pediatrician, Jamie’s parents voluntarily placed her in foster care because her health was in jeopardy and she needed to be readied for surgery to close the colostomy. In the time spent with her foster parents, Jamie made considerable gains, although at the time of the hearing on the petition in July 1981 she had minimal cerebral palsy and was still behind her peers in development; she remained highly susceptible to infections and rapid dehydration, requiring ready access to a doctor.
Jamie’s parents, as the Appellate Division observed, are people of “limited resources and abilities.” Between October 1979 and January 1981, they (with Jamie’s brother, approximately a year older) moved numerous times, among four counties, often residing with family or friends. They experienced extended periods of unemployment, inability to pay rent, lack of transportation, telephone, heat *392 and other amenities. Mr. M.’s whereabouts in this period were sometimes unknown, sometimes with his teenage girlfriend. From the start of the placement, a program of visits was arranged by the agency, interrupted by the parents’ moving out of the county, and by their alleged inability to arrange transportation, illness and other excuses. Several scheduled visits were missed without prior notice.
Originally, the plan was for the child to return to her parents when the doctor said she was well enough. While from the beginning visits and family counseling sessions were arranged by the agency, the first discussion of an actual plan for Jamie’s return took place around September 1979, when the parents were told they would need a suitable home, the means to support the child, a way to get her to a doctor when needed, and family counseling. The agency further advised that if the parents failed to take appropriate steps, a permanent neglect proceeding to terminate their rights would eventually be brought. Absent any input from the parents, who failed to keep an appointment to discuss a plan, this four-part plan was later put forth by the agency in a writing, and became part of an order of disposition entered in June 1980. The plan provided for reference by the agency to the State employment service and “any employment we may hear about”, and reference to the Keuka Housing Council and “advising them of vacancies we have heard of and by encouraging them in their pursuit of housing.” This was the usual agency plan.
The parents fulfilled none of the four components of the agency’s plan. They established no suitable home for any meaningful period of time, no means of support, no way to get the child quickly to a doctor when needed, and their cooperation in family counseling was sporadic at best. On the subject of housing, the senior case worker testified that she was informed that the parents couldn’t find housing because of a lack of funds, that she and Mrs. M. had discussed places where Mrs. M. might look for an apartment, and she had offered the use of her telephone. On the subject of employment, the record reflects no consultations or references, and contains only the parents’ testimony *393 that no steps were taken to help them find employment. No attempts by the agency to assist the parents in budgeting or securing public assistance are recorded.
In the view of the Family Court, which granted the petition and terminated parental rights on a “fair preponderance” standard both sides acknowledge now to be inapplicable (Santosky v Kramer, 455 US 745), the parents were not cooperative with the officials who attempted to plan with them and aid them in carrying out a plan for the return of their child. The court found that reasonable attempts had been made by the agency to assist in developing and encouraging a meaningful relationship between the parents and child. The Appellate Division, one Justice dissenting, disagreed, concluding that the record did not establish diligent agency efforts to remedy the conditions relied on in support of the termination proceedings, and that any plan must be evaluated in the context of the capabilities of the parents. In our view, the weight of the evidence more nearly comports with the findings of the Appellate Division.
In the statutory scheme for termination of parental rights, failure to cooperate with an agency is hardly without legal significance. The Social Services Law contemplates only reasonable attempts by an agency to foster the parent-child relationship, and a diligent undertaking serves to fulfill this requirement. The agency is “not charged with a guarantee that the parent succeed in overcoming his or her predicaments. Indeed, an agency that has embarked on a diligent course but faces an utterly unco-operative or indifferent parent should nevertheless be deemed to have fulfilled its duty.” (Matter of Sheila G., 61 NY2d 368, 385, supra.) Nor do diligent efforts require — in the words of the agency’s counsel — that the Department of Social Services be “a 24-hour babysitter and constant hand holder.” Parents must themselves assume a measure of initiative and responsibility; they have a duty to plan for the future of their child, and a failure to utilize medical, psychiatric, psychological and other social and rehabilitative services and material resources will be taken into account in determining whether parents have in fact met their statutory responsibility (Social Services Law, § 384-b, subd 7, par [c]).
*394 But to fault parents for a lack of cooperation presupposes that the agency has fulfilled, or been utterly frustrated in its efforts to fulfill, its own statutory obligations to strengthen the parental relationship, including specifically a duty to provide “services and other assistance to the parents so that problems preventing the discharge of the child from care may be resolved or ameliorated” (Social Services Law, § 384-b, subd 7, par [f], cl [3]). What is missing from this record, and what compels us to the conclusion that the petition must be dismissed, is any indication of agency efforts to address one of the underlying problems that beset these parents and kept them from regaining their child: essentially unemployment and financial instability, which stood in the way of their securing a decent place to live. Given the dominant position and resources of the agency, the legislative command that “the state’s first obligation is to help the family with services * * * to reunite it” (Social Services Law, § 384-b, subd 1, par [a], cl [iii]; see, also, Matter of Leon RR, 48 NY2d 117, 126) and the explicit requirements of the statute, such a void in the record forecloses a finding of permanent neglect. (See Matter of Sheila G., 61 NY2d 368, 381-382, supra; Matter of Star Leslie W., 63 NY2d 136.) An agency assuredly need not guarantee that parents will no longer be poor or unemployed, but neither can it, without more, simply impose on impoverished parents the usual plan, including the requirement, for return of their child, that they have a means of support and suitable home.
The Legislature has placed primacy on the right of parents to raise their children and the desirability of children to be with their natural parents. Though others may offer more comfort and be better able to provide for a child than its own parents, and though it may be argued that freeing a child for adoption by a foster family in a given situation serves the best interests of the child, still the drastic step of severing parental rights for neglect can only be taken when there has been compliance with the statute. Indeed, a consideration of the best interests of a child is not even reached unless it would be actually detrimental to encourage and strengthen the parental relationship. In this statutory scheme, the onus is on the *395 agency, before parental rights can be terminated, to make some attempt to assist parents, with counseling, planning, visitation and the procurement of housing and employment where that is necessary in order to help them overcome the problems that separate them from their children. (Matter of Sheila G., 61 NY2d 368, 384, supra.) There is no record of diligent agency efforts here.
Dismissal of the petition of course leaves open the question of custody, as well as any other issues that may have arisen in the nearly four-year life of this proceeding. While the parents argue before us that the record at the dispositional hearing was insufficient to continue custody in the agency, that ruling rested on the Family Court’s perception of the high level of skill and supervision required by the child’s health, an issue we have not considered on this appeal.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler, Meyer and Simons concur.
Order affirmed, with costs.