■ In the Matter of MICHAEL ANTHONY VINCENT J. and Another, Children Alleged to be Permanently Neglected. ST. CHRISTOPHER-OTTILIE, Appellant; LILLIAN T. et al., Respondents. [677 NYS2d 347] —Orders, Family Court, Bronx County (Richard Ross, J.), entered February 8, 1996, which, after a fact-finding hearing, dismissed separate petitions seeking termination of respondents' parental rights with respect to infants Michael Anthony Vincent J. and Rose Antionette J., reversed, on the law and the facts, without costs, the petition reinstated, findings of neglect entered, and the matter remanded for a dispositional hearing.

A review of the record as a whole demonstrates by clear and convincing evidence that the petitioner-appellant agency performed sufficiently "diligent efforts" to reunite the family as is required by Social Services Law § 384-b. Respondents permanently neglected their children despite the agency's efforts on their behalf. Accordingly, we reverse the order of the Family Court dismissing the petitions against the respondents seeking the termination of the parental rights of respondents Lillian T. and Kevin Vincent J. and transferring custody and guardianship to the petitioner St. Christopher-Ottilie and the Commissioner of Social Services of the City of New York.

Rose Antoinette J. was born on September 27, 1986, at Queens, New York, and Michael Anthony Vincent J. was born on October 27, 1989, at Lincoln Hospital, Bronx, New York. Lillian T. is the birth mother of the children herein and Kevin Vincent J. is the father of the children.

The children were placed with the Commissioner of Social Services of the City of New York on April 20, 1989 and November 15, 1989, respectively, by the Bronx County Family Court, and the Commissioner of Social Services of the City of

New York in turn placed the children with the Children's Aid Society. Subsequently, the children were placed with St. Christopher-Ottilie on September 30, 1991.

The petitions alleged that respondents Lillian T. and Kevin Vincent J. failed to follow through on the diligent efforts made by the agency caseworkers to encourage and strengthen the parental relationship.

The testimony of the agency caseworker, Ms. Lafontaine, described her repeated attempts to involve both respondents in planning for the children, including keeping regular and consistent contact with both the children and the agency, following through with parenting skills training, and psychological and psychiatric evaluations, and, in the case of the respondent father, undergoing a drug-abuse assessment. However, both respondents failed to keep adequate and consistent contact with the agency, and failed to maintain adequate contact with the children.

In the case of the respondent mother, she was often late for the scheduled visits, and failed and refused the caseworker's referrals for the required services. Of the 38 visits scheduled with the children in 1992, the respondent Lillian T. did not appear for 16 visits, and on the 22 visits for which she did appear, the respondent was late 14 times.

Thus, respondent Lillian T. attended full sessions with the children in 1992 in only 8 of 38 scheduled visits. Many of the visits were described as "chaotic". In one instance, respondent mother told the child Rose that she was behaving in an infantile manner, and then stated that she was going to take Rose into the bathroom and "beat her butt".

With respect to respondent Kevin Vincent J., no relationship developed between him and the children because of his inconsistent visitation. In some instances, there were four or five month gaps where said respondent did not visit the children at all. In 1992, respondent attended only 8 out of the 38 scheduled visits. He often failed to keep the appointments and rescheduled appointments the caseworker arranged. The child Rose Antoinette J. was placed in foster care due, in part, to the alleged drug abuse of the respondent Kevin Vincent J. The missed referrals made by the caseworker for him also included substance-abuse evaluations, which were also required.

Family Court, while noting respondents' failures with respect to cooperating with the agency's plans and efforts, concluded that the agency failed to give appropriate consideration to respondents' limitations and that respondents did all they could based upon their resources. However, the agency

addressed the respective limitations of each respondent, and was repeatedly rebuffed. For example, with respect to Kevin Vincent J., the caseworker attempted to accommodate him by referring him to one program where he could receive all of the services required in one day. The caseworker also provided transportation in order to facilitate respondent in meeting his goals. Also, visits with the children were also arranged for the same day and door-to-door transportation was provided for both respondents in order to assist them in keeping appointments for referrals.

With respect to Lillian T., similar scheduling and travel accommodations were made, but, as noted above, her attendance and cooperation were uneven at best. The agency caseworker informed said respondent that, in addition to visitation, psychiatric and psychological evaluations, and parenting skills, she would also require a home attendant to help her care for the children when the children were returned home. However, the respondent refused the offer of a home attendant, stating that she did not need one.

Respondent Kevin Vincent J. testified and in many respects confirmed the caseworker's account of his conduct. However, he stated he was never specifically told by Ms. Lafontaine what was expected of him. He stressed that they were homeless and were living in shelters and had attempted to cooperate and make visitation appointments.

While respondent Lillian T. did not testify, her social worker from Brookdale Hospital did. The hearing court apparently put great weight on this witness's "opinion" that respondents did not have a good therapeutic relationship with the petitioner agency's social worker. However, it is undisputed that respondent Lillian T., after briefly attending family therapy sessions at Brookdale Hospital, had her case closed in December 1991. She did not reappear until October 1992, shortly before the petition herein was initiated. Furthermore, the Brookdale therapist conceded that respondent was chronically late, did not cooperate with agency referrals, still needed to attend parenting classes and would have difficulty dealing with a hyperactive child. The witness admitted she was not qualified to test patients regarding possible mental retardation and that she had never worked with people who are mentally retarded.

Finally, testimony by respondents' "expert" should not have been admitted. While this consultant may have been properly qualified as an expert, her opinions were admissible only with respect to issues that involved professional or scientific knowledge or skill not within the range of ordinary training or intel-

ligence of the trier of fact (*Dufel v Green*, 84 NY2d 795, 798). The expert's testimony criticizing the agency caseworker's methodology and "grading" her performance addressed the dispositive legal issue of whether diligent efforts were sufficient, which is solely the province of the court. This witness's testimony was almost exclusively concerned with whether the agency's plan for respondents was adequate, given their means and limitations. While expert testimony is not specifically precluded and the "expert" could have testified as to whether Lillian T. was mentally retarded or whether a specific program was appropriate, her general evaluation and "grading" of the agency's efforts infringed upon the function of the court and certainly did not warrant a result favorable to respondent. Concur—Ellerin, J. P., Wallach, Williams and Mazzarelli, JJ.

Andrias, J., dissents in a memorandum as follows: The issue before us is not custody of the two children, who are not presently residing with the respondent parents. That issue will be resolved at the dispositional hearing that we all agree is necessary. The sole question here is whether the agency petitioning to terminate respondents' parental rights met its burden of demonstrating that it made "diligent efforts" to reunite the family as required by Social Services Law § 384-b.

More than five years after the period in issue, we are asked to review a record covering a period from October 1991 to January 1993 upon which the experienced Judge, who presided at the 10 court sessions and had an opportunity to hear and evaluate the witnesses, determined that petitioner had failed to make the requisite threshold showing that it had discharged its statutory obligation to exercise diligent efforts to encourage and strengthen the parental relationship (*see, Matter of Jamie M.*, 63 NY2d 388, 390). The burden of proof is placed upon the agency to make this threshold showing by clear and convincing evidence (*Matter of Sheila G.*, 61 NY2d 368, 373).

It has been stated that "when an agency has assisted a parent through meaningful efforts to provide counseling with respect to a problem (psychological, physiological, financial, and the like) that impedes the return of the child, to assist in the planning for the child's future, to aid in the procurement of housing or employment, and to schedule regular and meaningful visits with the child, it will be found that the agency has satisfied its statutory duty" (*Matter of Sheila G., supra*, at 384). The agency is not charged with a guarantee that the parent succeed in overcoming his or her predicaments and an agency that has embarked upon a diligent course but faces an utterly uncooperative or indifferent parent should nevertheless

be deemed to have fulfilled its duty (*Matter of Jamie M., supra,* at 393, citing *Matter of Sheila G., supra,* at 385). "Parents must themselves assume a measure of initiative and responsibility; they have a duty to plan for the future of their child, and a failure to utilize medical, psychiatric, psychological and other social and rehabilitative services and material resources will be taken into account" (*Matter of Jamie M., supra,* at 393).

However, "to fault parents for a lack of cooperation presupposes that the agency has fulfilled, or been utterly frustrated in its efforts to fulfill, its own statutory obligations * * * including specifically a duty to provide 'services and other assistance to the parents so that problems preventing the discharge of the child from care may be resolved or ameliorated'" (*Matter of Jamie M., supra,* at 394). Thus, in *Matter of Jamie M.* (*supra,* at 394), it was held that the petition was properly dismissed since there was no "indication of agency efforts to address one of the underlying problems that beset [the parents] and kept them from regaining their child: essentially unemployment and financial instability, which stood in the way of their securing a decent place to live".

The petitioner and Law Guardian cite numerous cases in which the agency was found to have exerted diligent efforts, by counseling and encouraging the parent to obtain psychological, psychiatric or drug counseling services, but the parent failed to do so (*see, Matter of Female J.,* 202 AD2d 340; *Matter of La'Vetta Danile S.F.,* 194 AD2d 384; *Matter of Christina Jeanette C.,* 168 AD2d 351). However, respondents cite cases where dismissal of the petition has been upheld where the agency failed to assist the parents in removing a single yet major impediment to return of the children, such as procurement of suitable housing (*see, Matter of Jason S.,* 117 AD2d 605; *Matter of Charmaine T.,* 173 AD2d 625).

The bulk of the testimony of the agency's caseworker, Mabel Lafontaine, dealt with her efforts to encourage regular visitation with the children and her referrals of respondents for various services; e.g., drug evaluation for Kevin and psychological counseling and parenting classes for Lillian. On March 24, 1995, upon Ms. Lafontaine's return to court pursuant to subpoena, the parties stipulated that Lillian's attendance record at the scheduled parent-child visits would be ascertained from the agency's records. Although this would appear to be a relatively straightforward task, the resulting stipulation and its evaluation remain a subject of controversy as reflected in the parties' briefs and arguments.

Respondents established that they were homeless for the

first 11 months after the case was referred to the petitioner. There was no evidence that Ms. Lafontaine actively assisted the respondents in procuring permanent housing. In fact, it appears from the record that Kevin was given the impression, based upon a court order dated August 30, 1991, that the only thing that was keeping him from being reunited with his children was the couple's lack of permanent housing. Thereafter, although he had little or no contact with petitioner agency and attended only four visits with the children in 1991 and eight of 38 in 1992, it appears that his efforts were focused on obtaining housing and those efforts were successful when the couple obtained suitable housing in September 1992. At the same time, Lillian enrolled in a program at Brookdale Hospital in Brooklyn, where she had given birth to the couple's son Alex a year earlier. From September 1992 through January 1993, just prior to the commencement of these proceedings, she and Alex, and on many occasions Kevin, attended 16 visits with Wendy Littman, a senior psychiatric social worker at Brookdale. Moreover, at certain junctures, the programs respondents were referred to were in different boroughs from the location of the parent-child visits and there is support for the conclusion that respondents' homelessness inhibited their ability to attend either scheduled visits with their children or the programs to which they were referred.

Most telling is Ms. Lafontaine's testimony that by the time she first prepared her plan for respondents on January 17, 1992, approximately two months into the period under review, she verified that the agency's goal was "04", a designation used for "adoption" or termination of respondents' parental rights. Thus, it appears that any efforts to reunite respondents with their children were preordained to fail inasmuch as, from the beginning of the placement, the agency charged with the obligation of exercising diligent efforts on respondents' behalf had already set the completely opposite goal.

The hearing court credited the testimony of Ms. Littman, based on her therapy sessions with Lillian T. at Brookdale Hospital, in which she stated that respondents did not have a good therapeutic relationship with Ms. Lafontaine. Ms. Littman was qualified by the court as an expert in psychiatric social work. She testified that she first met Lillian T. in 1991 upon her referral to the hospital's maternity shelter shortly after the birth of her son Alex. Lillian T. did not enroll in the program at that time but returned to see Ms. Littman on her own in September 1992. Between September 1992 and January 1993, Lillian T. attended 16 sessions with Ms. Littman.

While Kevin J. was not formally Ms. Littman's patient, he attended many of the sessions, which typically lasted 45 minutes. The couple brought their 14-month-old son Alex to each of the sessions. Ms. Littman described Alex as a happy, energetic and responsive child, and stated that the parents had a good relationship with him.

Ms. Littman stated that she was not familiar with the particular special needs of the subject children and had not in fact met Rose and Michael. However, she requested information regarding the children from Ms. Lafontaine and requested that arrangements be made for her to meet the children. Ms. Lafontaine set up the meeting in Queens on New Year's Eve 1993—a time and place that made it impossible for her to attend. Ms. Littman did not recall being invited to any other meetings at petitioner's offices.

Ms. Littman stated that she spoke with Ms. Lafontaine three times and exchanged correspondence. The witness felt, based upon those conversations and Lillian T.'s statements, that Ms. Lafontaine was placing demands on the couple and erecting barriers rather than working with the couple in a supportive way. Contrary to Ms. Lafontaine's view, Ms. Littman generally described Lillian T. as a concerned parent who was genuinely interested in working toward the return of her children. She had a similarly positive view of Kevin J., though she had considerably less contact with him. She attributed Ms. Lafontaine's lack of success to the fact that Lillian T. and Ms. Lafontaine did not have a positive therapeutic relationship. Ms. Littman did not think that Lillian T. was retarded. In addition, she characterized Ms. Lafontaine's plan for Lillian T. as fragmented and difficult for Lillian T. inasmuch as it required her to travel to different boroughs.

Support for the hearing court's conclusion, that Ms. Lafontaine placed demands upon the respondents rather than devising a plan in consultation with them and assisting them as the law requires, is found not only in the testimony of Ms. Littman, but in Ms. Lafontaine's testimony as well. The fact that Ms. Littman appeared on respondents' behalf provides a basis for the hearing court's conclusion that respondents did not attend the programs arranged by Ms. Lafontaine because they did not have a good relationship with her and had found help from Ms. Littman.

Thus, it cannot be said on the record before us that petitioner agency made sufficiently "diligent efforts" to reunite this family as required by Social Services Law § 384-b.

The hearing court found that while the respondents did not

do much at the early stages of placement, they eventually did all they could based upon their limited resources. Thus, the court concluded that petitioner failed to give appropriate consideration to respondents' limitations. The court's determination was also based upon its conclusion that respondents' work with Ms. Littman was evidence of the fact that they could enroll in a program and regularly attend. The only reference that the court made to the testimony of respondents' other expert, Ms. Winter, was related to the grade she gave to Ms. Lafontaine's efforts.

The record reflects that, while the question is close, this is not the type of case where the petitioning agency embarked on a diligent course, but faced utterly uncooperative or indifferent parents (*see, Matter of Sheila G., supra,* 61 NY2d 368, 385; *Matter of Jessica UU.,* 174 AD2d 98, 101), but one where the agency imposed a plan without any realistic or meaningful effort to provide the assistance necessary for the parents to overcome the particular problems that separated them from their children (*see, Matter of Jamie M.,* 63 NY2d 388, 394-395, *supra; Matter of Jessica UU., supra*).

As found by the Family Court, "[a]t the early stages of placement, [respondents] didn't do very much, or at least it certainly doesn't appear. At some point, they started to get themselves together after Alex's birth. They themselves took the meaningful steps. They went to Brookdale. They got into the program with Ms. Littman." The court concluded that respondents should not be charged with the difficulties the agency may have. It found "the key is the fact that respondents were working with Ms. Littman at Brookdale, who indicated they could get into the program at CBCC, which was a full service program, and the agency did not assist the respondents to get into that program. It's not a matter where an agency can say, we know what's best, do it our way. I think in this case, their way, FEGS, would not have been the full service program that Ms. Lafontaine wanted, but that the CBCC Program apparently would have been, and so for that reason, I think the agency has failed to show by clear and convincing proof that they met the standards. They established a prima facie case, but a prima facie case is not clear and convincing proof when everything comes out from the respondent's side." However, although it dismissed the petitions, the court erroneously failed to order a dispositional hearing to determine the best interests of the children.

"Dismissal of a permanent neglect petition leaves open the question of custody, as well as any other issues that may have

arisen during the life of the proceeding (*Matter of Jamie M., supra*, at 395).'' (*Matter of Jessica UU., supra*, at 102.) Particularly, where, as here, we have little or no inkling of what has developed since 1992 and nothing of what has occurred since February 1996, a dispositional hearing is clearly mandated. (*See also, Matter of Orange County Dept. of Social Servs. [Edward L.]*, 250 AD2d 853).

Therefore, I would modify the Family Court order only to remand the matters for a prompt and expeditious dispositional hearing and otherwise affirm. Concur—Ellerin, J. P., Wallach, Williams and Mazzarelli, JJ.