Matter of Joshua H. (2004 NY Slip Op 51042(U))

[*1]

Matter of Joshua H.

2004 NY Slip Op 51042(U)

Decided on September 17, 2004

Family Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 17, 2004

Family Court, Kings County
IN THE MATTER OF AN APPLICATION FOR JOSHUA H., RAQUEL H., and CHRISTIAN H., children under the age of eighteen alleged to be permanently neglected under SSL § 384-b (7)(a) by JOSEPHINE V., and RENEE H., Respondents.
BXXXXX-7/03

Lee H. Elkins, J.
This petition, brought by an authorized agency, St. Vincent's Services, under Social Services Law § 384-b[7][a] seeks to commit the guardianship and custody of the children, Joshua Hernandez (d.o.b. 1/14/91), Raquel (d.o.b. 3/6/94), and Christian (d.o.b. 6/14/01) to the agency for the purpose of consenting to adoption by their foster mother, who is the mother's sister. The respondent Josephine Virola is the children's mother. The respondent Renee Hernandez [FN1] is the children's father. The children came into foster care in July 2001, following Christian's birth with positive toxicology for heroin. The children were placed following the mother's admission to neglect based upon heroin addiction. The court at the time of placement in November 2001, directed that the mother enter an inpatient drug program and complete a parenting skills class. The children have been continually in foster care since that time. The period at issue is from August 2001 until September 13, 2003 when the petition was filed.
Petitioner entered into evidence, portions of the case record beginning in late August 2001 through September 11, 2003. Entries in the case record in evidence occur about once a month. Even so, there are gaps in the record. There is no entry in evidence for the months of October 2001, March, June, July, August, September, October 2002, March, April, and June 2003. In other words, there is no complete record of events occurring over any continuous one year period. However, the petitioner did call the case worker Castro-Reyes, who was assigned to the case from April 2002 until June 2003.
Summary of the progress notes
The initial progress note of August 27, 2001, states that Ms. Virola told the case worker that she did not know what to do to "get her kids back." This hand written note is signed by a case worker whose first name is "Norma" and whose surname is illegible. The case worker
informed the mother that there would be a conference to determine what services she would need. There is no evidence of when, or whether, such a conference was held or the outcome of the conference. The only case note entry in evidence for September 2001, signed by an MSW [*2]Schneider, states that the mother did not come for a visit at the agency on September 18.[FN2] There is no entry in evidence for October 2001. A case note entry for November 7, 2001, signed by Kim Spenser, states that the mother cancelled a visit "due to being in 7 - Day Detox." On November 15, case worker Spenser asked the mother whether she were enrolled in any drug program, and the mother presented the agency with proof that she completed the detox. The entry notes: "[Case worker] stated this was a great start, however it was just the first step. [Birth mother] then stated that she was scheduled to attend a 28 day detox at Staten Island University. [Case worker] stated this was great and asked [birth mother] to sign a release of information for the program so [case worker] could speak towards [sic] her progress. [Birth mother] signed the release. [Case worker] then explained ASFA and the importance of visiting with the children. [Birth mother] stated she understood." The next entry, of December 19, 2001 states that case worker Spenser asked the mother why she had not "gone to her program" as yet. The respondent explained that she wanted to see her son who would be "coming from upstate" for the holidays. There is no mention of Staten Island University detox, nor any reference to any referral by the agency.
The Service Plan Review [SPR] occurred on January 9, 2002. It was attended by MSW Schneider, identified as a supervisor, case worker Spenser, and an SPR co-ordinator. Apparently, neither the foster mother nor the respondent mother were present. The document reflects that the mother visited her children consistently at the agency and kinship foster home. Under "services being provided", the document states: "[birth mother] has entered & completed a seven day detox program; however, she has failed to enter a drug treatment program as yet. [Birth mother] needs to complete parenting skills classes & must obtain adequate housing/income." Under "status of ppg/current and planned activities," the document states: "[Birth mother] needs to complete inpatient drug program." A case note entry of January 23, 2002 states that the purpose of a meeting between Ms. Spenser and the mother on that date was to discuss "referrals." According to the note, the worker asked the mother about entering "the program," and the mother stated that she now had to wait for them to find a bed for her. The case worker "discussed with the [birth mother] a new referral for a new program. [Birth mother] stated that this wasn't necessary as they would find a bed." Presumably, this entry relates to the 28 day detox at the Staten Island University Hospital, which is the only "program" mentioned in the records to that date. On February 20, there was another meeting between the mother and Ms. Spenser "to discuss referrals." Again, the case worker asked the respondent "why she hadn't gone to the Detox program. [Birth mother] stated that she was going soon. [Case worker] confronted [birth mother] and stated that she always had an excuse." There is no evidence in the case record that any further "discussion" about "referrals" occurred in March or April 2002. The single April note in evidence is signed by Ms. Castro-Reyes. The May notes are signed by a supervisor, Ms. Papillon.
On May 22, 2002, case work supervisor Papillon met with the mother. The case note entry states that the mother "appeared nervous but interacted appropriately with" the supervisor. [*3]The supervisor "informed [birth mother] that the children will have been in care for a year in the upcoming month of July and [birth mother] has not completed any of her service plan. Supervisor informed [birth mother] that she has not entered into drug treatment, therapy [FN3] or parenting. In addition, [birth mother] has not secured housing. Sup[ervisor] informed [birth mother] of ASFA time frame and related that if she continues not to plan the agency will change the goal to adoption and proceed to terminate her rights.[FN4] * * * Sup[ervisor] related that the [case worker] would be referring her for services and [birth mother] should continue to seek housing and maintain regular visitation with the children." [emphasis added] There are no progress notes in evidence for June through October, 2002.
On November 27, 2002 the supervisor Papillon met again with the respondent mother. The case note states: "Sup[ervisor] informed [birth mother] that she is not planning effectively for her children and she has not completed any of her service plan regarding in patient drug treatment, counseling, parenting, securing housing and income. [Birth mother] acknowledged that she has not completed any of the programs and is not currently in any program. [Birth mother] stated that a friend of hers told her about a drug treatment program and ahe [sic] would like to go there. [Birth mother] stated the name of the program is Veritas. Sup[ervisor] related that she would call the program to make a referral but stated that if it was a [sic] outpatient program [birth mother] would have to be referred to another [FN5] inpatient program as per court order. Sup[ervisor] also related that she would find out if parenting and therapy would be available at Veritas and if not she would be re-ferred [sic] for services. Sup[ervisor] inquired about [birth mother's] housing status. [Birth mother] related that she still resides with her mother but has filed out a NYC housing application. [Birth mother] also related that she has no income at this time ans [sic] must re-open her PA and Medicaid case. [Birth mother] related that she went to the PA office last week but has to go back. Sup[ervisor] enoucraged [sic] [birth mother] to continue to plan and provided her with token fare."[emphasis added] The next case note entry is again by Ms. Papillon dated January 6, 2003 for an event date of December 31, 2002. The note reflects that the supervisor in a meeting with the foster mother stated, "that the status of the case remains adoption. Sup[ervisor] related that [birth mother] is not planning effectively for her children as she has not completed any of her service plan."[emphasis added] In evidence is a referral for the mother to Veritas Therapeutic Community, Inc. "for residential drug treatment, [*4]individual counseling and parenting skills." The letter states that the appointment is for December 13.
The next case note entry is by Ms. Papillon dated January 29, 2003. It reflects a call to the agency supervisor from "Ms. Woolfolk of Visiting Nurse Services." According to the entry, the caller informed the supervisor that the mother was to be discharged from Interfaith Hospital's seven day detox program "on Friday," and requested "information regarding Veritas drug treatment and the availability of a bed" for the respondent. The supervisor gave the caller the name and telephone number of a person to contact at Veritas, "so [birth mother] could be admitted for treatment." Two days later, Ms. Woolfolk again called the agency to inform them that the mother, having finished the seven day detox program at Interfaith "today," "now needs to enter a 28 day rehab before she can go to Veritas." Ms. Papillon noted that: "Ms. Woolfolk related that [birth mother] cannot do the 28 day program because she did not keep her appointment at EVR on 1/23 and her PA case has been closed. Sup[ervisor] related that this has been an ongoing issue with [birth mother]. Sup[ervisor] related that she has encouraged [birth mother] to go to her PA office to reinstate her benefits and was even given car fare to keep the appointment given, but she has not followed through. Ms. Woolfolk related that she would assist [birth mother] to re-open her case but once the case is re-opened [birth mother] would have to do another detox and rehab program before being admitted to Veritas." There are no other case records in evidence before the SPR conference document dated May 7, 2003.
The respondent mother and her sister, the foster mother, attended the May 7, 2003 service planning conference. Attendees included Ms. Papillon, the case worker Reyes, the respondent mother and foster mother, Joshua, the third party reviewer and an ACS case manager. The document in evidence states that the goal for the next six months is that the foster children "will be adopted by" the foster mother. In this SPR document, the plan is for the mother to "enter [a] residential drug treatment program; to complete [a] parenting skills training program; to start therapy; to obtain Medicaid; and to continue to visit on a consistent basis." [emphasis added] Under the section entitled "services being provided," the document states: "[Birth mother] is not enrolled in drug rehabilitation, parenting or counseling. [Birth mother] is enrolled in a case management program to assist with obtaining drug program with her HMO/Medicaid." [emphasis added] Under "primary resource's perception of problems/ goals," the document states: "[birth mother] acknowledges a long time drug problem & was on methadone for many years. However, she was still using heroin and sometimes cocaine while on methadone. [Birth mother] is aware that TPR will be filed but does not want to lose her children." There is no further case note entry in evidence until July 17, 2003. The new case worker Cabrerra [FN6] wrote that upon speaking to the respondent after a visit, "[birth mother] stated that she was still having trouble with her HMO and that she is only allowed a certain amount of days in a program that the HMO will pay for. [Case worker] informed [birth mother] she will check with Veritas to see if they will consider her for their program."
The next progress note in evidence, dated August 13, 2003, states that the respondent told the case worker that she will be enrolled in the NADA/Project ACE program on 8/14/03. The [*5]respondent provided the case worker with a copy of her enrollment letter. She was "given token fare for her appointment at Project ACE." Although another supervisor, Rosalyn Chernoff, spoke to the mother on August 22, 2003, about a medical appointment for Christian, she did not ask the mother about her enrollment.
The remaining case note entries in evidence all relate to the dates September 10 - 11, 2003. On September 10, Ms. Chernoff "introduced [her]self to Ms. Virola and informed her that [Ms. Chernoff] would be covering her case until a new caseworker was hired." Ms. Chernoff writes that she reviewed the service plan with the mother and "stressed that in order to have her children returned to her she must complete the service plan. I reminded her that she needed to enter and complete a long term drug program in order to address her substance abuse problem. [Birth mother] stated that she was ordered to enter a drug free program and that she did not think she would be able to do that because of the antidepressants and sleep medication she takes. I informed her that the court did not specifically order that she enter a drug free program but that she enter a residential drug program." When asked what medication she was taking, the mother told the case worker that she had been prescribed Paxil by her doctor. She also informed the supervisor that she would buy Ambien and sometimes methadone, off the street. The mother admitted that she last used heroin on July 4, 2003. The respondent mother told Ms. Chernoff that she wanted to be drug free, including from methadone. She provided the supervisor with an appointment letter for NADAP Project ACE, and with certificates from Cornerstone detox "and a short term program." The supervisor told the mother that the service plan also included completion of a parenting skills program and attending individual therapy. The respondent explained to the case worker that "she was put enrolled [sic] in an HMO that does not pay for these services." The supervisor informed the respondent that she would locate programs that would accept her without traditional Medicaid.
On September 11, 2003, Ms. Chernoff contacted St. Vincent's Services mental health clinic, which includes outpatient substance abuse counseling, to obtain information regarding the respondent's eligibility for the program in light of her Medicaid status. A representative of the St. Vincent's Substance Abuse program advised Ms. Chernoff that the mother "should come in to the program in order to complete an assessment regardin [sic] her needs as they relat [sic] to her substance abuse problem and to discuss the Medicaid issue." The representative told the supervisor that the mother could walk in any day Monday to Friday from 9 a.m. to 5 p.m.. The supervisor gave the mother a letter to St. Vincent's, and car fare. On the same date, and for the first time insofar as the records in evidence reflect, the supervisor referred the mother for a parenting skills class and individual counseling. She referred the mother to Dr. White's Community Center, which did not require a fee for their services. The representative from Dr. White's requested a letter from the agency and for the mother to contact them. Ms. Chernoff gave the mother the letter of referral for parenting skills and individual counseling and sent a copy to Dr. White. The agency filed the instant petition two days later.
Testimony
Ms. Castro-Reyes testified that she was the worker assigned to the respondent mother's case from April 2002 to June 2003. According to Ms. Reyes, she first met with the respondent in August 2002. According to the worker, the mother admitted to buying "off the street" heroin, [*6]methadone and prescription medication "to help her sleep." She discussed the respondent's need to enter drug treatment, "as soon as possible." The respondent told the worker that she was in a methadone maintenance program. The witness testified that she referred the respondent mother to Cumberland Diagnostic and Treatment Center. In fact, there is a written referral for the mother to Cumberland dated September 18, 2002. The referral states that the respondent is being referred to an outpatient substance abuse program, and gives the name and address and telephone number of the person to contact. The respondent told the case worker that she did not want to go to Cumberland because it was a drug free program and she was taking prescription medication for depression. Subsequently, the respondent stated that she did go to Cumberland, but had problems with her Medicaid. On cross-examination, the case worker acknowledged that Cumberland is not an inpatient program.
Because the respondent wanted a program where she could continue to take psychotropic medication, the respondent told the case worker that she wanted to go to Staten Island University Hospital. According to the case worker, she called SIU but they "didn't take her." The case worker then referred the respondent to Project Return [Palladia], in the Bronx. According to the case worker, Project Return treats patients taking antidepressants. The case worker gave the mother the referral on October 2, 2002 for an appointment two days later. The case worker testified that when she asked the respondent mother about Project Return, the mother stated that they put her in detox and "threw her out within a week because she had no Medicaid."In response to this information, the case worker testified that she "encouraged the mother to attend PA." She testified that she knew the respondent had missed public assistance appointments and Medicaid appointments and that her case was closed. On cross-examination, the case worker acknowledged that she actually was informed by the mother that although she had Medicaid, her HMO would not pay for further inpatient treatment. The case worker acknowledged that the respondent told the agency she was having problems with her HMO, and that every time she went into detox she would have to leave earlier than the program recommended. The case worker testified that she did not contact Medicaid or give the mother a letter for Medicaid. She testified that "it is the client's responsibility to follow through with Medicaid." She acknowledged that there is no one at the agency with expertise in Medicaid.
In early 2003, according to the case worker, the mother stated that she wanted to attend Veritas. However, the mother informed the worker that they would not accept her Medicaid. The case worker expressed her opinion that the mother simply wanted to "put off" treatment, and did "not seem to want to be drug free." She referred the mother to the St. Vincent Service's "drug treatment program," telling her that they would "refer" her to drug programs and facilitate her getting Medicaid. The worker testified that this is a mental health clinic affiliated with the child care agency. On cross-examination, the witness acknowledged that the St. Vincent's clinic is not an inpatient program. She testified that there is no one at the child care agency who is a specialist in substance abuse. She testified that St. Vincent's Services mental health program had drug counseling. She testified that the two entities are separate and that no one from the mental health program was assigned to the mother's case. The case worker testified that she believed a counselor there could assess the mother's needs.
With regard to parenting skills and therapy, Ms. Castro-Reyes testified that she assumed such services would be available through the drug programs, so she did not make any [*7]independent referrals. With regard to the mother's housing, Ms. Castro-Reyes testified that the mother lived with the maternal grandmother and the respondent's older daughter, but did not have her own housing.
The case worker testified that the agency informed the mother during the May 2003 SPR that her rights would be terminated. She testified that as of her last day at the agency, on June 13, 2003, the mother had not completed and was not enrolled in a drug treatment program.
The respondent mother testified that a year before her children entered foster care on July 31, 2001, she had been enrolled in a MICA program at Kings County Hospital. The respondent mother testified that the court's dispositional order in the neglect case was that she enter a residential drug treatment program. The mother testified that she attempted to do so on many occasions. She testified that she went to four separate detox programs at Woodhull, Interfaith, ACI, and Cornerstone. She testified that she also completed one rehabilitation program. When she went to Cornerstone in 2003, they kept her for nine days, and told her she had to leave, when Medicaid would not cover the 35 day rehabilitation portion of the program. She testified that when she entered attempted to attend Veritas, her HMO would only pay for detox, not for residential treatment. The respondent testified that she never told the agency that she didn't have Medicaid. She testified that in November 2002, when her PA was closed, she went to a fair hearing and her benefits were re-instated. She testified that she informed both Ms. Reyes and the agency supervisors that her HMO would not pay for residential drug treatment. She testified that no one at the agency offered to assist her with her problem with Medicaid. She testified that she had gone to the Medicaid office and had spoken to a case manager. The mother also testified that she received Visiting Nurse Services.
The respondent testified on the law guardian's cross-examination that she went to St. Vincent Service's mental health program. She testified on the agency's cross-examination that Ms. Reyes told her that she "could probably work with" St. Vincent's "if she could not get into residential." She testified that explained at the St. Vincent's clinic about her HMO. She was informed to complete intake and that they would "see what they could do." She testified that she completed the intake. The St. Vincent's clinic wanted the respondent to attend there from 9 to 11 a.m.., Monday through Friday. The respondent testified that those hours conflicted with her Methadone maintenance program, located in Canarsie.
Findings of fact
It is undisputed that the court's dispositional order in the underlying neglect proceeding required that the respondent enter a residential drug program. That this was appropriate is apparent from the mother's testimony that she had been in Kings County Hospital's outpatient MICA program, and that she continued to purchase heroin and prescription drugs on the street. The progress notes reflect that the respondent mother was enrolled in a seven day detox facility in early November 2001. On November 15, the mother presented the agency with proof that she completed the detox. The entry notes: "[Case worker] stated this was a great start, however it was just the first step. [Birth mother] then stated that she was scheduled to attend a 28 day detox at Staten Island University." The SPR of January 9, 2002 acknowledged that the respondent completed the detox, and concluded that the respondent needed to enter and complete a residential drug treatment program. In late January the assigned case worker asked the mother [*8]whether she had entered SIU's rehabilitation program. The respondent stated that she was waiting for a bed. In late February the case worker again met with the respondent mother "to discuss referrals." However, the case worker Spenser merely asked the mother whether she had gone "to detox." No referral was made for any program, residential or otherwise. There was no discussion about SIU. There is no evidence in the case record that any further discussion about referrals occurred in March or April 2002. Although the single April note in evidence is signed by Ms. Castro-Reyes, who testified that she was assigned the case in that month, she also testified that she did not meet with the mother until August 2002. On May 22, 2002, supervisor Papillon met with the mother. She informed the mother that the case worker would be making referrals, and that the mother should continue to seek housing and to maintain regular visitation with the children. The supervisor also informed the respondent "about ASFA" and that her parental rights could be terminated. There are no progress notes in evidence for June through October, 2002. There is no evidence of an SPR held six months after the prior SPR in January.
Ms. Castro-Reyes testified that when she met with the respondent mother in August 2002, the respondent admitted that she used heroin, and Ambien which she purchased on the street. She told Ms. Reyes that she was in a methadone maintenance program. Ms. Reyes referred the respondent mother to Cumberland Diagnostic and Treatment Center, an outpatient program, on September 18, 2002. This is the first evidence of any referral by the agency. The children had been in foster care for almost 14 months. The case worker acknowledged that there were difficulties with this referral, aside from it being an outpatient program. The respondent told the case worker that she did not want to go to Cumberland because she was taking prescription medication for depression. Subsequently, the respondent told the case worker that she did go to Cumberland, but had problems with her Medicaid. There is no evidence that the case worker investigated or addressed either of these problems.
The case worker testified that the respondent told her that she wanted to go to Staten Island University Hospital. This is the facility where she had been scheduled to complete the 28 day detox. According to the case worker, she called SIU but they "didn't take her." The case worker did not explain the failure of SIU to accept the mother. She then referred the respondent to Project Return [Palladia], in the Bronx, which treats patients taking antidepressants. Project Return was also an outpatient program. Ms. Reyes testified that she case worker gave the mother the referral on October 2, 2002 for an appointment two days later. The case worker testified that when she asked the respondent mother about Project Return, the mother stated that they put her in detox and "threw her out within a week because she had no Medicaid." In fact, the case worker was informed by the mother that although she had Medicaid, her HMO would not pay for inpatient treatment.
The supervisor, Ms. Papillon met with the mother again on November 27, 2002. The mother asked the agency to refer her to Veritas, a program she learned about through a friend. Ms. Papillon told the respondent that she would call the program to make a referral but that if it was an outpatient program, the respondent would have to be referred to an inpatient program as per court order. The supervisor told the respondent that she would find out if parenting and therapy would be available at Veritas, and if not she would be referred for those services. On December 11, the respondent received a referral for Veritas Therapeutic Community, Inc. "for residential drug treatment, individual counseling and parenting skills." The letter states that the [*9]appointment is for December 13. There is no evidence in the record that the respondent ever was referred to an inpatient program prior to that date. The supervisor observed that the respondent had no income and lived with her mother. However, the progress note also reflects that the respondent had gone to PA the previous week and "had to go back." This is consistent with the mother's testimony that when her PA was interrupted she requested a fair hearing and had it re-instated. The progress note also reflects that the respondent filed out a NYC housing application. The supervisor "encouraged" the respondent to continue to plan. Nonetheless, in a note of January, 2003, the supervisor states that the "status of the case" as of December 31, 2002 "continues to be adoption."
On January 29, 2003, the agency supervisor Papillon received a call from Ms. Woolfolk of Visiting Nurse Services. Ms. Woolfolk informed the supervisor that the mother was to be discharged from Interfaith Hospital's seven day detox program on Friday (January 31), and requested "information regarding Veritas drug treatment and the availability of a bed" for the respondent. The supervisor gave the caller the name and telephone number of a person to contact at Veritas, so that the respondent could be admitted for treatment. Two days later, Ms. Woolfolk again called the agency to inform them that the mother, having finished the seven day detox program at Interfaith, needed to enter a 28 day rehab before she could go to Veritas. Ms. Woolfolk informed the agency supervisor that the respondent "cannot do the 28 day program because she did not keep her appointment at EVR on 1/23 and her PA case has been closed." The supervisor, simply stated that "this has been an ongoing issue with " the respondent. The court notes that there is no indication either in the progress notes or in the testimony of Ms. Reyes that this "ongoing issue" was ever addressed by the agency in any meaningful way.[FN7] On this occasion, the court notes that Ms. Papillon apparently missed the fact that the mother may have been in the detox program since January 23. Ms. Papillon told Ms. Woolfolk that she had "encouraged [birth mother] to go to her PA office to reinstate her benefits and was even given car fare to keep the appointment given, but she has not followed through."
The court finds that the preponderance of the evidence [FN8] establishes that the mother did in fact follow through, and that the issue was the Medicaid coverage, and not the lack of Medicaid. The respondent testified without contradiction that she had gone to PA and that her benefits were reinstated after a fair hearing. She also testified that she never told the agency that she didn't have Medicaid. The petitioner failed to adduce any evidence that the mother's Medicaid was not active. The court notes for example, that Ms. Woolfolk was employed by the Visiting Nurse [*10]Services to assist the respondent mother. Apparently, the respondent had the means through public assistance to retain a visiting nurse. Ms. Woolfolk told the agency supervisor "that she would assist [birth mother] to re-open her case but once the case is re-opened [birth mother] would have to do another detox and rehab program before being admitted to Veritas." [emphasis added] The significance of this evidence is that if VNS could assist the mother to determine and to correct the problem with her Medicaid coverage, then the agency also could have done so. There is no evidence in the record, however, that Ms. Woolfolk was in fact able to provide assistance to the respondent with her Medicaid problem. Subsequent events show that the problem remained unresolved.
The case worker Reyes acknowledged that the respondent told the agency she was having problems with her HMO, and that every time she went into detox she would have to leave earlier than the program recommended. The mother testified to the same effect. The case worker testified that she did not contact Medicaid or give the mother a letter for Medicaid. In the case worker's view, it was respondent's responsibility to follow through with Medicaid. She acknowledged that there is no one at the agency with expertise in Medicaid. Her response to the respondent mother's Medicaid problem was to refer the mother to St. Vincent Service's mental health clinic, which she testified either included outpatient drug counseling or would refer the mother to a program. She believed that the clinic might be able to assist the mother with Medicaid, since there was no one at the child protective agency with expertise. The respondent testified without contradiction that she went to the St. Vincent's clinic and explained about her Medicaid problem. She was told to complete intake and that they would "see what they could do." The mother testified without contradiction that when she completed intake, they wanted her to attend their out patient program, which conflicted with her methadone maintenance program.
The court credits the respondent mother's testimony that she did go to Medicaid, and spoke to a case manager. The mother's version of the events is corroborated by the agency's contemporaneous record. The progress notes of the SPR held May 7, 2003, attended by Ms. Papillon, Ms. Reyes, the mother and the foster mother, state that the mother "is not enrolled in drug rehabilitation, parenting or counseling [but]... is enrolled in a case management program to assist with obtaining drug program with her HMO/Medicaid." [emphasis added] In the next case note entry in evidence, dated July 17, 2003, the case worker Cabrerra wrote that the mother "stated that she was still having trouble with her HMO and that she is only allowed a certain amount of days in a program that the HMO will pay for." [emphasis added] The case worker's response was to inform her that the case worker would "check with Veritas to see if they will consider her for their program."
When the supervisor Ms. Chernoff took over the case in August 2003, she reminded the respondent that the court ordered her to enter a residential drug program. The mother then provided Ms. Chernoff with precisely the same information she provided to Ms. Reyes a year earlier. When asked what medication she was taking, the mother told the case worker that she had been prescribed Paxil by her doctor. She also informed Ms. Chernoff, as she had informed Ms. Reyes, that she would buy Ambien and sometimes methadone, off the street. The mother admitted that she last used heroin on July 4, 2003. The respondent mother told the case worker that she wanted to be drug free, including from methadone. She provided the case worker with an appointment letter for NADAP Project ACE, and with certificates from Cornerstone detox and an [*11]unidentified "short term program." Presumably, this is the short rehabilitation program that the respondent mother testified to having attended. The circumstances of her attendance are undisclosed on the record. The case worker told the mother that the service plan also included completion of a parenting skills program and attending individual therapy. The respondent explained to the case worker that "she was put enrolled [sic] in an HMO that does not pay for these services." The case worker informed the respondent that she would locate programs that would accept her without traditional Medicaid. Ms. Chernoff then contacted the St. Vincent's clinic, and referred the respondent there. This is precisely what Ms. Reyes did, and to the same effect. St. Vincent's told Ms. Chernoff that the respondent could walk in for intake any day of the week. Unlike the previous workers, Ms. Chernoff for the first time referred the respondent mother to Dr. White Community Center, where the mother could receive parenting skills and counseling, without traditional Medicaid. The agency filed the petition two days later.
The court takes judicial notice that under Social Services Law section 364-j, Medicaid beneficiaries in New York State must join a Medicaid Managed Care Plan.[SSL 364-j[3][a] Those who do not make an election within sixty days of receiving notice to do so, the State will automatically enroll in an HMO. Once enrolled, the person has ninety days to opt out or is locked in for twelve months. The participant is thereafter required to receive medical assistance services from a managed care provider. The "managed care provider" "provides or arranges for the provision of medical assistance services and supplies to participants directly or indirectly (including by referral), including case management." [SSL 364-j [1][b][emphasis added]] This statute explains the entry in the agency case record of May 7, 2003, that the mother "is not enrolled in drug rehabilitation, parenting or counseling [but]... is enrolled in a case management program to assist with obtaining drug program with her HMO/Medicaid."
Under the managed care statute, substance abuse services are considered "special care" [SSL 364-j [1][k]], and are to be provided through a "specialty care center," "accredited or designated by an agency of the state or federal government or by a voluntary national health organization as having special expertise in treating the disease or condition for which it is accredited or designated." The court also takes judicial notice of that those who receive services in a residential substance abuse program are exempt from enrollment in an HMO and may choose not to enroll. [SSL 364-j[3][c][i]] Consequently, had the respondent mother been able to enroll in a residential program, she would have been exempt from the HMO limitation, by statute. It appears, therefore, that there was in fact a mechanism by which the managed care issue could have been addressed through Medicaid.
Conclusions of law
A "permanently neglected child" is defined as one "in the care of an authorized agency and whose parent ...has failed for a period of more than one year... substantially and continuously or repeatedly to maintain contact with or plan for the future of the child ...notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship." [Social Services Law § 384-b[7][a]] The petitioner here bears the burden of proving by clear and convincing evidence that the respondent permanently neglected her children by failing for a period of more than a year following their placement into foster care, "substantially and continuously or repeatedly" either to maintain contact with the children or to plan for the future of the children, although physically and financially able to do so, notwithstanding the agency's diligent efforts to [*12]encourage and strengthen the parental relationship. [SSL 384-b[7][a]]
As a threshold to proving permanent neglect, the petitioner must prove by clear and convincing evidence [See, Matter of Jamie M., 63 N.Y.2d 388, 393], that it applied diligent efforts "to assist, develop and encourage" a meaningful parent-child relationship by offering appropriate services to the respondent parents, including by consulting and cooperating with the parents in developing a plan of appropriate services; making suitable arrangements for visitation; providing services and other assistance to the parents to resolve or ameliorate the problems preventing the child's discharge from care; and keeping the parents informed of the child's progress, development and health. [Social Services Law § 384-b[7][f][1-4]; Matter of Sheila G., 61 N.Y.2d 368]
In Sheila G., the Court held that the diligent efforts requirement is a condition precedent which the agency must prove before the court may even consider whether the parent has met his or her duty to maintain contact with and plan for the future of the child. The agency's obligation was described by the Court as follows:

 ... [T]o enable a child to return to his or her family, an agency must have the capability to diagnose the problems of the parent and of the child; access to a host of concrete supportive and rehabilitative services; cooperation with community treatment programs (such as health, alcohol, and drug treatment); and a casework staff that can motivate the parents to avail themselves of services .... lower courts have recognized that an agency is in a superior position to the parent with respect to the planning factor. The parties are by no means dealing on an equal basis. The parent is by definition saddled with problems: economic, physical, sociological, psychiatric, or any combination thereof. The agency, in contrast, is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority are obligatory.... The corollary to the agency's dominant position is that indifference by the agency may greatly serve to impede a parent's attempts at reunification.... Of course, transcending the practical reasons for providing a threshold requirement that an agency exercise diligent efforts toward reuniting parent and child is the strong public policy that before the State may terminate parents' rights it must first attempt to strengthen familial ties.
[Matter of Sheila G., supra, 61 N.Y.2d at 381-383]
The failure of an agency to fulfill its statutory mandate to provide services and other assistance to the parent so that the problems preventing the child's discharge from foster care may be resolved, absolves the parent from liability for failing to cooperate in the agency's plan. [See, e.g., Matter of Jamie M., supra, 63 N.Y.2d 388] It is, therefore, the petitioner's burden initially to prove by clear and convincing evidence [SSL 384-b[3][g]] that the agency has fulfilled, or has been utterly frustrated in its efforts to fulfill, its statutory obligations to strengthen the parental relationship, including specifically a duty to provide "services and other assistance to the parents so that problems preventing the discharge of the child from care may be resolved or ameliorated." [See, e.g., Matter of Westchester Co. D.S.S. o/b/o Brian M., 221 A.D.2d 456 [2nd [*13]Dept. 1995]; Matter of Fatima Danet F., 233 A.D.2d 504 [2nd Dept. 1996]] As a corollary to the agency's burden of proof by clear and convincing evidence that it engaged in diligent efforts as defined in the statute, any ambiguity in the record as to the availability of services necessary to address problems preventing the reunification of the parent and child, must be resolved in favor of the parent.
The respondent in this case was ordered by the court into residential drug treatment, which clearly was an appropriate service necessary to address the problem causing the children's placement into foster care. The court's order imposed an obligation upon the agency to "assist the parent... in obtaining ... medical care or psychiatric treatment." [FCA 1055 [c]] The evidence in this case does not support the conclusion that the agency was faced with an indifferent or utterly uncooperative parent. Here the mother testified without contradiction, that she attended four separate detox facilities. Ms. Chernoff noted, without elaboration, that the mother completed a "short term residential program." The record corroborates the mother's testimony that she continually told the agency that her Medicaid was restricted and that she was unable to access a long term residential treatment program. That the mother was unable to access residential care is corroborated by the statement of Ms. Woolfolk of VNS to the agency supervisor Papillon. Although that conversation related to a PA sanction, subsequent entries in the case record clearly reflect that the respondent had a case manager at Medicaid, and was having difficulty with her "HMO" in obtaining payment for residential services. Both the respondent and Ms. Reyes testified to the same effect.
The agency failed to determine the specific problem facing the respondent in her efforts to obtain payment for residential treatment, although the agency had been informed of the problem, and knew that the court's order mandated residential care. The mother informed the agency that she was in a methadone maintenance program, but wished to be drug free. She repeatedly entered detox programs. She repeatedly explained that she was unable to enter residential care, given the limitations of her managed care. The agency workers made no effort either to verify or to clarify this information through the mother's case management program at Medicaid. No one from the agency ever even placed a telephone call to Medicaid.[FN9] Instead, the agency case worker testified that dealing with Medicaid was the client's responsibility.
The agency, with its superior resources and expertise, could have investigated to determine the validity of the respondent's claim that her managed care plan would not permit her to remain in residential treatment. The court finds that it is reasonable to expect the agency to make such efforts to intercede with Medicaid to ensure that the mother had the means to pay for residential treatment. The court does not find it unduly burdensome on the agency's resources, to impose such an obligation upon an agency case worker. Essentially, the agency needed to be informed of the rules regarding Medicaid managed care, and to assist the respondent to navigate the Medicaid system to enable such payments to be made. Instead, the workers' limited efforts were to provide the respondent mother with letters of referral to outpatient programs, and to ask her whether she was attending treatment. When in December 2002, the supervisor Papillon [*14]finally referred the respondent to an inpatient program at Veritas, she was informed by the VNS worker Ms. Woolfolk that the respondent could not be accepted because of problems with Medicaid. The supervisor's response was that this was a recurring problem. She took no steps to investigate the cause of the problem by contacting the mother's DSS worker or Medicaid directly. Ultimately, Ms. Woolfolk volunteered to investigate the problem. No other referral ever was made for the mother for residential drug treatment.
Consequently, the court finds that the agency failed to make reasonable efforts to assist the mother to obtain the essential medical and therapeutic service needed to resolve or ameliorate the problems preventing the children's discharge from care. [Accord., Matter of Kip D., 115 A.D.2d 864 [3rd Dept. 1985] ["Although respondent was denied public assistance for non-compliance with the application requirements, petitioner failed to instruct her as to the appropriate procedures. In our view, petitioner failed to prove that it exercised the meaningful and diligent efforts required to assist respondent in overcoming her problems and to reunite her with her child, as required by statute."]; Matter of Jawan Y., 278 A.D.2d 540, 542 [3rd Dept. 2000]["respondent did complete one 28- day treatment program but that she has not successfully completed longer courses, although she has received some substance abuse counseling. Despite petitioner's recognition of this being the primary problem, its sole assistance to respondent in this regard was to advise her that she must complete a substance abuse program."]
The petition is dismissed.
Dated: September 17, 2004__________/sg/_______________
Lee H. Elkins, JFC
Footnotes

Footnote 1: The evidence clearly and convincingly shows that the respondent Hernandez, who did not participate in the proceeding, had no contact with the agency during the two years prior to the petition being filed, and contributed no support to the children during that time. The court finds that Mr. Hernandez's consent to adoption is not required. [DRL § 111]

Footnote 2: The agency does not contend that the respondent did not consistently visit with her children, and a January 9, 2002 SPR report reflects that in the previous six months the mother visited her children consistently at the agency and kinship foster home.

Footnote 3: While therapy was no doubt appropriate, given the mother's subsequent statement that she had been prescribed Paxil for depression, there was no mention of therapy in the original service plan review.

Footnote 4: Actually, where children are placed in the home of a relative or where "the agency has not provided to the parent or parents of the child such services as it deems necessary for the safe return of the child to the parent or parents," NY-ASFA does not require that an agency file a termination of parental rights petition after children have been in care for fifteen months. [SSL § 384-b [3][l][i][A][C]]

Footnote 5: There is no evidence of a prior referral to any inpatient program.

Footnote 6: Apparently this was a new case worker, as Ms. Castro-Reyes testified that she only had the mother's case until June 2003.

Footnote 7:The court takes judicial notice that under Social Services Law section 366 subd. 1, par. a, the mother would have remained eligible for Medicaid even though her public assistance benefits were sanctioned for failing to meet WEP requirements. Consequently, even were the evidence to establish that the mother's Medicaid was "inactive"due to sanction, further investigation into the cause of the sanction would have been indicated. 

Footnote 8: The agency, of course, bears the burden of proof by clear and convincing evidence, that it engaged in efforts to assist the respondent, and the respondent's lack of co-operation. [SSL 384-b[3][g]] 

Footnote 9: Medicaid managed care maintains a hotline for clients wishing to transfer out of a managed care plan, or to claim exemption or exclusion from Medicaid Managed Care. The number is 1-800-505-5678.