Matter of K.Y.Z. (W.Z.) (2025 NY Slip Op 05781)

Matter of K.Y.Z. (W.Z.)

2025 NY Slip Op 05781

Decided on October 21, 2025

Court of Appeals

Rivera

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on October 21, 2025

No. 68 
 

[*1]In the Matter of K.Y.Z.
W.Z.,
 Appellant,
et al.,
 Respondent
Good Shepherd Services,
 Respondent.

Emily S. Wall, for appellant.
Andrew T. Ford, for child K.Y.Z.
Geoffrey P. Berman, for respondent Good Shepherd Services.
American Civil Liberties Union, et al., Asian American Legal Defense and Education Fund, et al., Brooklyn Defender Services, et al., Martin Guggenheim, amici curiae.

RIVERA, J.

A parent's right to the custody and care of their child is "perhaps the oldest of the fundamental liberty interests" protected by the Constitution (Troxel v Granville, 530 US 57, 65 [2000]). The Legislature has thus recognized that "parents are entitled to bring up
their own children unless the best interests of the child would be thereby endangered" (Social Services Law § 384-b [1] [a] [ii]). To protect the rights of parents and the health and safety of children, the Legislature has declared that "the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home" (id. § 384-b [1] [a] [iii]). Accordingly, for a child services agency to prevail in a proceeding to permanently terminate parental rights, it must establish by clear and convincing evidence that it undertook "diligent efforts to encourage and strengthen the parental relationship" or that such efforts would have been "detrimental to the best interests of the child" (id. § 384-b [7] [a]; see [*2]also Santosky v Kramer, 455 US 745, 769 [1982]). A child services agency has the burden to submit sufficient proof on the record that, if credited, demonstrates under the applicable clear and convincing evidence standard that it made "affirmative, repeated, and meaningful efforts to assist the parent in overcoming [particular obstacles]" to reunification (Matter of Sheila G., 61 NY2d 368, 385 [1984]).
The record below demonstrates that the child services agency failed to present evidence of diligent efforts to help reunite father and his child before it petitioned to terminate father's parental rights. First, the agency failed to adequately accommodate and account for father's linguistic needs. Father does not speak or understand English, but the agency never provided interpretive services during family visits, which were the most significant interactions between father, the child, the agency caseworker, and the child's foster parents. The agency also failed to provide interpretation services at the child's medical appointments or even give father advance notice of when those appointments were scheduled, precluding him from taking part in that critical aspect of his child's care. Second, despite the child services agency's belief that father's lack of insight into mother's mental health needs and their impact on parenting the child was the weightiest barrier to reunification, it failed to refer father to individual counseling or a support group so he could gain that insight. Finally, although the child services agency identified father's living arrangements and onerous work schedule as further obstacles to reunification, it took few steps to help him secure appropriate housing or employment, which could have made it easier for father to visit his child.
In short, in this proceeding, rather than foster reunification, almost all of the child services agency's actions—and its failures to take action—ensured that the parent-child bond disintegrated. Thus, the child services agency failed to meet its burden as a matter of law, and we reverse.
I.
A. The Record Evidence of the Agency's Efforts
Father W.Z. and mother Q.Y.Z. are parents of K.Y.Z., their only child. One week after the child's birth in 2014, the New York City Administration for Children's Services (ACS) removed the newborn from his parents and placed him in foster care with Good Shepherd Services (the agency), based on ACS's assessment that mother's schizophrenia rendered her unable to care for him. Thereafter, Family Court found that the parents neglected the child, and the child entered foster care. In 2017, the agency petitioned to terminate father's and mother's parental rights on the ground of permanent neglect. During several months between 2019 and 2020, Family Court held a fact-finding hearing where father, an agency caseworker, and mother's doctor testified, and the agency submitted several documents from its case file.
According to that evidence, father is a Chinese immigrant whose native and primary language is Fuzhou, a Chinese dialect.[FN1] By his own account, father speaks "average" Mandarin,[FN2] and only "a few words" [*3]of English. He does not read or write in any language and therefore cannot communicate other than by spoken word. The agency caseworker, who was assigned to the case from 2014 to 2017, testified that the agency placed the child in four different foster placements during that period, none of which included people who spoke Fuzhou or Mandarin or shared the family's culture. The child's most recent
placement was with foster parents who speak English and Spanish. Since the agency had no staff who spoke Fuzhou or Mandarin, neither the agency nor the foster parents could communicate with father absent an interpreter's assistance. There was no record evidence that, by the time it commenced the termination proceeding, the agency had ever placed the child in a Fuzhou- or Mandarin-speaking setting to expose him to any language his parents understood. The only record evidence of the child's exposure to those languages was when his parents spoke them during visits.
The caseworker admitted that she was not aware for a full year, until a court appearance in June 2015, that father's primary language is Fuzhou, not Mandarin, and she did not testify that she appreciated the difference between the two. She had usually communicated with father through a Mandarin interpreter. The caseworker also stated that the agency wanted father to learn English. Yet, she did not explain why his doing so was necessary for reunification, and the agency presented no evidence that it referred father to English language classes or otherwise assisted him in English language acquisition.
The caseworker further testified that the agency held case planning conferences twice a year. Between 2014 and 2017, father attended six such conferences, during which the agency ordinarily provided a Mandarin interpreter. Not until March 2016 did the caseworker raise with her supervisor the option of getting a Fuzhou interpreter.
Before 2017, the agency did not provide an interpreter to enable him to communicate to the child, the caseworker, or the foster parents during father's visits with the child. Father testified that the resulting language barrier made him feel like a "dummy." The caseworker testified that although she supervised the visits, she could not provide father with contemporaneous feedback. Nor could the caseworker, without the aid of an interpreter, discuss with father additional services that would aid reunification. Despite this language barrier, the caseworker observed father's visits and noted that he brought the child clothes, toys, and food. The caseworker also described the child as calm and responsive to father, and father as engaged with his child, during the visits. Although the agency's records indicate that father sometimes arrived late or left early from the scheduled two-hour visits, the agency failed to present evidence of how the caseworker could ask about father's work schedule without an interpreter. Further, the agency did not present any evidence of why it had not adjusted the visitation or even sought to learn why father was not able to stay for full two-hour visits.
The caseworker further testified that to fulfill the agency's service plan, she initially scheduled parental visits with the child for twice a week. However, one month into the child's foster care placement, father and mother claimed that their demanding work schedules forced them to ask for less frequent visits. Father testified that he worked in the restaurant industry, and that an employment agency in Chinatown referred him to temporary shifts in various restaurants, including in Massachusetts, Ohio, and Virginia. Many referrals were to restaurants in "the countryside," where father could earn more money. Father relied on the employment agency "very often" to find work. While many of his placements were in other states, father testified that he never specifically asked for placements within the City and that his typical practice was to accept "whatever job [the employment agency] had for [him]." Father traveled by bus to his out-of-state shifts. Mother found similar work through the same employment agency, but she would sometimes get fired. [*4]Father claimed that he had to work "more often," traveling out of state "[v]ery frequent[ly]" during portions of the foster placement. Often, father spent only one to five nights in the City per month. The caseworker testified that she advised father to visit the child more often and offered to assist with mass transit costs. Father testified that he explained to the caseworker that he "needed money, to work and support himself." However, he did not recall the agency assisting him in searching for local employment, and the agency presented no evidence of any such efforts, although father testified that the agency wanted to help mother find work.[FN3]
Father tried to visit the child, despite his work schedule. The caseworker testified that when the parents' respective work assignments made joint visitation difficult, father and mother made sure to take turns so that one parent visited the child every other week. When father was in the City, he would visit the child once a week. Father also described his efforts to visit the child when he was working out-of-state. He testified that he would travel to the City on an overnight bus, arrive at around 3 am, sleep for a few hours, and visit the child in the morning. Father would leave the City at around 6 pm that same day, taking a bus back to his out-of-state work assignment and often arriving in the middle of the night. Father described these trips as "very exhausting."
Father testified that he maintained housing in the City. According to the caseworker, father cooperated with home inspections, even traveling from out-of-state to avoid delay.
At one point, when the parents were living in a shared apartment with several people, the agency informed father that he needed to find a larger apartment to facilitate the child's return home, but father testified that the agency provided no assistance with finding affordable housing or guidance on how to navigate the City's shelter system.
Other than at the conferences, there is no record evidence that the agency gave father feedback or discussed additional services to foster reunification. Although the caseworker asserted that between conferences she communicated with father by telephone, she did not testify to the length or substance of any such conversations.
According to the caseworker, the agency's service plan for father "was to engage in a parenting class, visitation with [the child], and to plan for [the child's] return." The agency's "primary concern" was that father "lacked insight into [mother's] mental health," and that he "seemed unaware of her illness," because he had stated that she was "fine," although he understood she was taking medication daily. However, the caseworker never referred father to services to address his "insight" into mother's mental illness, such as individual counseling sessions or a support group. Moreover, although mother's therapist told father he could attend mother's therapy sessions, mother only sporadically attended those services herself, and the caseworker did not testify that the agency took any steps to encourage or assist father's attendance, such as helping father coordinate the sessions with his work schedule. Based on the caseworker's testimony, the agency advised father during biannual conferences that it would not be viable for mother to be alone with the child upon reunification. In response, father expressed a willingness to hire someone to watch the child while he worked. The agency presented no evidence that it helped father search for a prospective babysitter.
The record evidence demonstrates that the agency took years to provide father with access to the basic services it deemed part of the plan for reunification. The caseworker explained that, due to the difficulty of finding a parenting skills class in Mandarin, it took two years—until 2016—to find a suitable class. Once enrolled, father received a certificate of completion. Although the agency determined that father should attend dyadic therapy with the child,[FN4] the caseworker did not make a referral until the end of 2016. Father [*5]then completed an introductory session for services to commence in January 2017. However, due to issues involving mother, unrelated to any conduct by father, the sessions did not begin until August 2017, the same month the agency filed its petition to terminate father's parental rights.
The caseworker testified that, according to her notes, father was concerned about his child and requested "to be updated on all medical and other well-being appointments." Soon after the child's removal, father met with the agency's educational specialist to discuss, through an interpreter, referring the child to services from the City's Early Intervention Program. Father consented to an assessment, and the child was subsequently diagnosed with global development, speech, and feeding delays. The child's individual plan recommended occupational and physical therapy, speech-language therapy when it became appropriate, special instruction, feeding therapy, and applied behavior analysis therapy. The agency initially did not inform father about the periodic meetings—which were held in English—to discuss the child's progress and potential service changes, although the foster parents and an agency representative attended. When the caseworker informed father about specific meetings, father attended, including in 2016 with the child's teacher and in 2017 for an Early Intervention Program session. The agency did not arrange for the child's therapists to meet with father or request that the therapists participate in meetings with father with the aid of an interpreter. The agency also did not notify father when the foster parents took the child to various medical appointments.
The agency replaced the caseworker in 2017, shortly before it commenced termination proceedings. The caseworker testified that father expressed concern about his ability to communicate with her successor, as he "want[ed] to be able to express his concerns, ideas, etc. to the agency case planner and/or supervisor, but the language barrier ma[de] that difficult." Father explained that he wanted to be reunited with his child and would work towards that goal, but if that was not possible, he supported the child's foster mother potentially adopting him.
B. Lower Court Determinations
Family Court concluded that the agency proved by clear and convincing evidence that mother's mental illness precluded her from appropriately caring for the child. The court further determined that "the agency's diligent efforts, although minimal, . . . were reasonable, as required by statute," and that the agency met its burden of proving that "both parents . . . permanently neglected [the child]."[FN5] Family Court continued:
"For this Court, the difficulty in making this finding is that the Court would have liked the agency to do more, to have done more, to have done better, to have even followed the Court's orders, which to date they still haven't followed all of them. But nonetheless, the Court does make a finding that the efforts made were reasonable, although they could have done more and should have done more . . . [T]he Court simply found that the agency made minimal efforts required by law and those efforts were reasonable. And the parents failed to respond accordingly."
To Family Court, the "biggest issue" was "the limited insight of both parents of [mother's] mental health illness, that sort of then results in her continued struggle with trying to address that." At a dispositional hearing that concluded in September 2022, Family Court found that the child's best interest was "to be freed for adoption."
The Appellate Division affirmed Family Court's order (228 AD3d 560 [1st Dept 2024]). As relevant to father, the Appellate Division held that "clear and convincing evidence supports the determination that, despite the agency's diligent efforts, he permanently neglected the child by failing to consistently maintain contact with or plan for the future of the child" (id. at 561). It found the agency's efforts diligent, and that it "adequately addressed the language barrier by using Mandarin interpreters to communicate with [father] and referring him for dyadic therapy and a parenting skills class that were
provided in Mandarin, which he understood" (228 AD3d at 561-562, citing Matter of Chelsea C. [Bethania C.], 84 AD3d 504 [1st Dept 2011]). The Appellate Division added that the agency showed that there was no available foster home in which the parents spoke Mandarin or Fuzhou, and while the agency "urged [father] to attend classes to learn English . . . he refused to do so" (id. at 562). It concluded that despite the agency's diligent efforts, father "visited the child only about once a month before the petition was filed," and there was no evidence that father "gained insight into his parental decisions or [mother's] inability to be a caregiver for the child" (id.).
II.
Parental Rights and the Agency's Burden in a Termination Proceeding
"[T]he interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]" (Troxel 530 US at 65; see also Lassiter v Department of Soc. Servs. of Durham County, N.C., 452 US 18, 27 [1981] [terminating the parental relationship is a "unique kind of deprivation"]). The Supreme Court has declared that "[f]ew forms of state action are both so severe and so irreversible" as terminating parental rights (Santosky, 455 at 759; see also Matter of Ricky Ralph M., 56 NY2d 77, 80 [1982] [describing termination of parental rights as "total and irreversible"] [internal quotation marks omitted]). The Legislature has found and codified that "the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home" (Social Services Law § 384-b [1] [a] [iii]). However, a parent's rights can be terminated where they have permanently neglected their child (see Sheila G., 61 NY2d at 380). Social Services Law § 384-b (7) (a) defines, in relevant part, a "permanently neglected child" as
"[A] child who is in the care of an authorized agency and whose parent or custodian has failed for a period of . . . at least one year . . . following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child."
To terminate parental rights on the ground of permanent neglect, a court must conclude that the petitioning agency established by clear and convincing evidence that it made "diligent efforts to encourage and strengthen the parental relationship" (Social Services Law § 384-b [7] [a]; Sheila G., 61 NY2d at 373). The clear and convincing evidence standard—the most demanding burden in the civil legal system—"adequately conveys to the factfinder the level of subjective certainty about [their] factual conclusions necessary to satisfy due process" (Santosky, 455 US at 769). Additionally, the agency's obligation to make diligent efforts reflects that it is in a "superior position" as compared to the parent (Sheila G., 61 NY2d at 381). As the Court recognized in Sheila G., "[t]he parties are by no means dealing on an equal basis. The parent is by definition saddled with problems: economic, physical, sociological, psychiatric, or any combination thereof. The agency, in contrast is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority [are] obligatory" (id. [internal citations and quotation marks omitted]).
"Diligent efforts" is statutorily defined as
"reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child, including but not limited to:
(1) consultation and cooperation with the parents in developing a plan for appropriate services to the child and [their] family;
(2) making suitable arrangements for the parents to visit the child . . . ;
(3) provision of services and other assistance to the parents . . . so that problems preventing the discharge of the child from care may be resolved or ameliorated;
(4) informing the parents at appropriate intervals of the child's progress, development and health . . ." (Social Services Law § 384-b [7] [f]).
In Sheila G., this Court expounded on this threshold diligent efforts requirement. It explained that an agency "must always determine the particular problems facing a parent with respect to the return of [their] child and make affirmative, repeated, and meaningful efforts to assist the parent in overcoming these handicaps. In evaluating the over-all efforts undertaken by the agency, the courts should always refer to the statutory guidelines" (61 NY2d at 385 [emphasis added]). An agency has not made diligent efforts to reunite the parent and child if it fails to provide particular services aimed at the barriers to reunification that it has identified. And, as the Legislature recognized, "the degree to which a parent has upheld [their] obligations to [their] children cannot be meaningfully measured when the agency itself has not undertaken diligent efforts on behalf of reuniting parent and child" (id.). Indeed, the Sheila G. court cited research showing that a parent's ability to overcome barriers to reunification may correlate to the agency's commitment and actions. As the research found, " 'parents who perceive their child care agency as unhelpful and as opposing their reunification with their child are less frequent visitors and are less likely ever to regain custody' " (id. at 382, quoting Marsha Garrison, Why Terminate Parental Rights?, 35 Stanford L Rev 423, 483 [1983]). Thus, the agency's efforts, and the degree to which they address the family's individual needs and are designed to help them overcome barriers, "may have a profound practical effect on what later may be viewed as the success or failure of the parents' efforts to plan for the future of the child" (id.).
Economic challenges, like those experienced by father, are often the most difficult to overcome because lack of financial resources may be at the root of other barriers to reunification. The Supreme Court in Santosky recognized that parents in termination proceedings "are often poor," hindering their efforts to regain custody (455 US at 763). Our Court has also recognized this obstacle to reunification, as well as an agency's obligation to take diligent efforts to address poverty and its role in family separation:
"The Legislature has placed primacy on the right of parents to raise their children and the desirability of children to be with their natural parents. Though others may offer more comfort and be better able to provide for a child than [their] own parents, and though it may be argued that freeing a child for adoption by a foster family in a given situation serves the best interests of the child, still the drastic step of severing parental rights for neglect can only be taken when there has been compliance with the statute" (Matter of Jamie M., 63 NY2d 388, 394 [1984]).
To be sure, an agency "need not guarantee that parents will no longer be poor or unemployed" (id.). However, "neither can it, without more, simply impose on impoverished parents the usual plan, including the requirement, for the return of their child, that they have a means of support and suitable home" (id.). To the [*6]extent that a parent's financial circumstances pose a barrier to reunification, the statutory scheme requires an agency "to make some attempt to assist parents, with . . . the procurement of housing and employment where that is necessary in order to help them overcome" those problems (id. at 395).
Courts must also consider whether the parent has been "utterly unco-operative or indifferent" (Sheila G., 61 NY2d at 385) and thus undermined the agency's attempts at diligent efforts. "Parents must themselves assume a measure of initiative and responsibility," and their failure to utilize "services and material resources will be taken into account in determining whether parents have in fact met their statutory responsibility" (Jamie M., 63 NY3d at 393). Absent such recalcitrance by the parent, however, an agency is held to its burden. As the Court explained in Sheila G.:
"[W]hen an agency has assisted a parent through meaningful efforts to provide counseling with respect to a problem (psychological, physiological, financial, and the like) that impedes the return of the child, to assist in planning for the child's future, to aid in the procurement of housing or employment, and to schedule regular and meaningful visits with the child, it will be found that the agency has satisfied its statutory duty" (id. at 384).
Standard of Review
/Para>
The Court "may review findings of fact, reached by the trial court under the proper evidentiary standard and affirmed by the Appellate Division, only to determine whether they enjoy support in the record" (Matter of Hailey ZZ., 19 NY3d 422, 430 [2012], citing Matter of Star Leslie W., 63 NY2d 136, 147 [1984]). However, father's argument that the agency failed to identify and provide services to address his specific needs to overcome the barriers to reunification raises a question of law as to the threshold showing required for an agency to establish diligent efforts in support of a finding of permanent neglect by clear and convincing evidence. Proof in the record that the "child-care agency . . . has satisfied its statutory obligation is a threshold consideration and a necessary prerequisite to any determination of permanent neglect" (Sheila G., 61 NY2d at 385-386; see also Matter of Michael B., 58 NY2d 71, 73 [considering the legal issue of whether "the evidence in th(e) record is legally insufficient to meet the clear and convincing evidence standard" in a termination of parental rights proceeding]). These legal standards are well established, and the parties do not contest them. Instead, they dispute the application of those standards here, where the father required linguistically and culturally appropriate services and particular assistance to address the obstacles to reunification that the agency identified.[FN6]
III.
The Agency Failed to Undertake Diligent Efforts
The record evidence is legally insufficient to support a finding that the agency met its burden of establishing by clear and convincing evidence that it undertook diligent efforts to strengthen father's and the child's relationship. First, the agency did not take adequate steps to overcome the persistent language barrier between father and the child, the caseworker, and the foster parents. Most troublingly, the agency utterly failed to provide interpretation services during father's visits with his child. This failure meant that father could not communicate with the caseworker, and consequently, father was unable to receive feedback or discuss additional services during visits. The lack of interpretation services during visits also meant that father could not contemporaneously communicate with the child's foster parents. Even if the agency could not place the child in a Fuzhou- or Mandarin-speaking foster home, the record is devoid of proof of any steps [*7]the agency undertook to help the child learn or be exposed to his parents' native or spoken languages, outside of hearing his parents speak during visits. Notably, father expressed discomfort during visits without interpretation services. He also informed his prior caseworker that he wanted to communicate with the agency, "but the language barrier ma[de] that difficult."
Contrary to the dissent's claim, the fact that the child had developmental and speech delays cannot excuse the agency's failure to address the language barrier (see dissenting op at 5). Not exposing the child to Fuzhou or Mandarin meant that, during critical years for language acquisition, the child had no exposure to either language. By placing the child in a succession of homes where no one spoke Fuzhou or Mandarin during the child's early developmental years, the agency made no efforts to compensate for this obstacle by placing the child in a Fuzhou- or Mandarin-speaking educational or social setting. In addition, the agency often failed to notify father of the child's medical appointments or offer to provide an interpreter, even though father informed the agency that he was concerned about his child and requested "to be updated on all medical and other well-being appointments." Further, the language barrier at visits prevented father from communicating with his caseworker or the child's foster parents, repeatedly depriving him of pivotal opportunities to receive feedback and discuss his service plan. Relegating such opportunities to periodic conferences was insufficient on this record to support a finding that the agency made reasonable efforts to address obstacles to father's reunification with the child.[FN7]
The agency's failures exacerbated the child's disconnection from his father's culture and language by solidifying the language barrier between the child, his parents, and the foster parents. The agency's attempted efforts to accommodate the father's linguistic needs by providing interpreters in limited contexts did not reasonably support parent-child bonding. The agency also failed to present evidence why, after the caseworker learned father's primary language by happenstance at a court appearance, the caseworker took an entire additional year to raise with her supervisor the prospect of finding a Fuzhou interpreter for subsequent conferences. Notably, the agency failed to explain why it took action that may have violated a state regulation that requires service agencies to make "reasonable efforts . . . to communicate with the child and [their] family in their primary language" when providing services aimed at enabling a child in foster care to "return to [their] family at an earlier time than would otherwise be possible" (18 NYCRR 423.2 [b]; 423.4 [m] [2]). The agency also failed to present evidence of why it acted in apparent contradiction to ACS policy, which requires agency staff to "proactively initiate the conversation about the individual's/family's preferred language" when working with individuals who are limited English proficient (Administration for Children's Services, Language Access Policy, 7 [2021], available at https://www.nyc.gov/assets/acs/pdf/immigrant_services/2021/LanguageAccessPolicy.pdf [last accessed Sep. 19, 2025]).
It bears emphasizing that before an agency can seek to terminate a parent's fundamental right to the custody and care of their child, it must ensure clear and precise communication so that the parent knows what they need to do and understands how the agency will assist them. The statutory, regulatory, and policy mandates assume the same. Here, by linguistically isolating father from his child and the child's caretakers, the agency failed to make diligent efforts to strengthen the parental relationship.
Second, the agency failed to provide father with services that meaningfully assisted him with overcoming the "primary" barrier to reunification of father's apparent "lack of insight" into mother's mental illness, and the additional barrier that father's low-wage employment made it difficult to visit the child as often as the agency recommended. The record demonstrates that the agency failed to provide father with linguistically and culturally appropriate services to improve his understanding of mother's mental health [*8]needs, or to help him learn how to care for his child in a household with a mother with schizophrenia. The agency did not refer father to individual therapy sessions or support groups, to assist father in overcoming his own obstacles to appreciating mother's mental illness and understand how best to provide for his son in light of that illness. Although the record contains evidence that the agency informed father that he could attend mother's therapy sessions, it also demonstrates that mother did not regularly attend her own sessions, and the agency made no arrangements for father to discuss the sessions he did attend in order to gain the necessary insight the agency claimed he lacked. Moreover, even when father said that he was willing to hire a babysitter rather than leave his child alone with mother, the agency took no steps to help father find, or cover the cost of, this childcare.
With respect to father's employment, the agency was aware of father's economic circumstances, including that his employment resulted in constant travel out of state and that he was attempting to attend visits in the middle of his shifts. Although father did not recall asking for help to find local work, there is nothing in the record to indicate that the agency offered such assistance. The dissent's attempt to minimize this failing is unpersuasive (see dissenting op at 6-7). The agency made no efforts to help father search for local employment, which could have allowed the father to visit the child more often and ameliorating one of the barriers to reunification that the agency itself identified. Further, the agency delayed dyadic therapy for two years, even though the agency identified it as helpful to improve the parental relationship and the quality of the visits. Through no fault of father, he was unable to begin dyadic therapy sessions until just days before the agency filed a termination petition.
Furthermore, the agency provided no evidence that father was uncooperative or intentionally undermined its efforts to provide services meant to further the goal of reunification. The record shows that father attended services when provided, and that he visited his child as his work schedule allowed, including taking exhausting same-day bus trips in and out of the City to be with his child and return to work in time for a night shift. Father thus acted in accord with his express statement to the agency that he wanted to be reunited with his child.
The dissent misunderstands this Court's power of review when claiming that we "[e]schew[ ] the proper standard of review," because we detail "more effective steps the agency could have taken to promote reunification" (dissenting op at 3-4). "Whether there is sufficient evidence in the record to satisfy the clear and convincing standard presents a question of law reviewable by this Court" (Matter of Westchester County Med. Ctr. [O'Connor], 72 NY2d 517, 529 n 3 [1988]). Because the "clear and convincing evidence standard . . . forbids relief whenever the evidence is loose, equivocal or contradictory," we must review the record to ensure that Family Court's termination of father's parental rights did not rest on evidence of that nature (id. at 529 ["Nothing less than unequivocal proof will suffice . . . "]). "Reviewing the entire record in this manner does not involve making new factual findings, as the dissent suggests" (id. at 529 n 3; cf. dissenting op at 6-7).
Indeed, the dissent's insistence that we must overlook the deficiencies in the evidence is plainly contrary to the statutory scheme and our duty to review for sufficient compliance. Indeed, we cannot measure the agency's diligence in a vacuum. Each example we provide of what the agency failed to establish is an objective reference point. The comparison makes all the more glaring the agency's failure to undertake diligent efforts.
Family Court concluded that the agency's efforts were "minimal," and that it should have done more. Although the court correctly articulated the relevant legal issue—whether the agency made diligent efforts to strengthen the parental relationship—it relied on Appellate Division case law that appeared to permit a diligent-efforts finding based on a minimal standard. We reject that such minimal efforts can, as a matter of law, constitute diligence. Holding that the agency's minimal efforts were sufficient is fundamentally at odds with the agency's high burden of proof and its obligation to make efforts to foster reunification based on a parent's particular needs. The record here establishes that the agency was not diligent, as it did not make [*9]"affirmative, repeated, and meaningful efforts to assist the parent in overcoming [the obstacles]" to reunification (Sheila G., 61 NY2d at 385).
Finally, while the dissent notes that the child has now been in the foster care system for over 11 years and decries our decision as causing "further delay" (dissenting op at 8), it is the agency's failure to undertake diligent efforts in the first place, from the start of its intervention in the family's life 11 years ago, that creates the present state of affairs, not father's efforts to vindicate his constitutional right to the care and custody of his child. The delay as this case worked its way through the courts is unfortunate, but it is the potential result in any case where an agency removes a child from their home for a lengthy period and then fails to undertake the requisite diligent efforts to strengthen the parental relationship. Such a delay cannot justify abdicating our role in holding the agency to its statutory burden (see Sheila G., 61 NY2d at 285-286). The parent's core constitutional right to the care and custody of their child demands no less.
IV.
Conclusion
Clear and convincing evidence of an "agency's diligent efforts to encourage and strengthen the parental relationship" is a demanding standard (Sheila G., 61 NY2d at 380). That heavy burden applies to agency conduct for good reason. Every parent has a constitutional right to the care and custody of their child—an interest "far more precious than any property"—and any lesser standard risks erroneous termination and irreparable damage to the family (Santosky, 455 US at 758-759). Because "the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home" (Social Services Law § 384-b [1] [a] [iii]), an agency must identify the obstacles to reunification and execute a plan intended to address the family's particular challenges. Some cases require more services than others, and some require language assistance and mental health services, as was the case here. Those services must allow a parent to take maximum advantage of the opportunity to address the causes that led to a child's removal in the first instance. The record in this proceeding does not support a finding that the agency established its statutory burden that it diligently worked toward reunification.
Accordingly, the Appellate Division's order should be reversed, without costs, and the petition dismissed.

CANNATARO, J. (dissenting):

KYZ, the child who is the subject of this termination of parental rights proceeding, has faced tremendous challenges for most of his life. He was removed from his parents' custody days after his birth [*10]primarily because his mother suffers from schizophrenia that renders her unable to adequately care for him. Following removal, father, an itinerant worker in the restaurant industry who has historically only found work in places far outside New York City, encountered difficulties maintaining a visitation schedule. Moreover, father speaks very little English and cannot read or write in any language, presenting a host of communication challenges. Additionally, the child was diagnosed with developmental delays at a very young age which rendered him largely nonverbal during visitation. Both parents were adjudicated to have neglected the child, and mother's parental rights were eventually terminated, a determination that is not on appeal here.
I agree that the New York City Administration for Children's Services was under a legal obligation from the time it placed KYZ in its care to exercise diligent efforts to encourage and strengthen the parental relationship between the child and his father, with a goal towards reunification. Those efforts were ultimately unsuccessful in this case. And, it can hardly be disputed that the relationship between father and child might have benefitted from a greater amount and better-coordinated delivery of agency resources. But our precedent makes plain that this is not the applicable legal standard. Because the majority, in the process of cataloging what it finds to be the many failures of respondent to exercise better efforts at reunification, articulates a novel and enhanced standard of review, and engages in impermissible factfinding, I respectfully dissent.
The majority fundamentally mischaracterizes the legal issue raised on this appeal. Properly framed, the issue is whether there is record support for the affirmed finding of permanent neglect and, more specifically, for the affirmed finding that the agency satisfied its statutory obligation to make diligent efforts to facilitate the child's return to father. Under the circumstances of this case, I would conclude that there is.
In order to determine that a parent has permanently neglected their child, the court must find that the petitioning agency has demonstrated by clear and convincing evidence that, during the relevant time period following the child's placement in the agency's care, the parent failed "substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship" (Social Services Law § 384-b [7] [a]; see Matter of Sheila G., 61 NY2d 368, 380 [1984]). "[C]onsistent with the health and safety of the child," the agency's primary responsibility is to provide services that will help reunite the family (Social Services Law § 384-b [1] [a] [iii]; Matter of Jamie M., 63 NY2d 388, 394 [1984]). The statute, consequently, further defines diligent efforts as "reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and the child, including but not limited to," arranging for visitation and providing services to address the problems preventing the child's return (Social Services Law § 384-b [7] [f]; see also Matter of Star Leslie W., 63 NY2d 136, 142 [1984]). Given that this a fact-laden determination, it is well-settled that Family Court's affirmed findings, made under the proper evidentiary standard, are reviewable only for record support (see Matter of Hailey ZZ. [Ricky ZZ.], 19 NY3d 422, 430 [2012]).
The majority sets forth a litany of deficiencies in the agency's handling of father's case. Eschewing the proper standard of review, the majority instead conducts its own wide-ranging factual assessment of other, more effective steps the agency could have taken to promote reunification, in pursuit of what is essentially a de novo review of the record. In so doing, the majority casts father's fact-bound argument that the agency failed to make diligent efforts as raising a question of law as to the threshold showing an agency must make to satisfy its statutory burden, citing to no relevant supporting authority (see majority op at 17, citing Sheila G., 61 NY2d at 385-386 [stating that the agency has the initial burden of proving it has satisfied its statutory duty] and Matter of Michael B., 58 NY2d 71, 73 [1983] [addressing whether the Appellate Division properly applied a new legal standard imposed by the United States Supreme Court while the appeal was sub judice]; see also majority op at 22, citing Matter of Westchester County Med. Ctr. [O'Connor], 72 NY2d 517, 522, 529 n 3 [1988] [addressing whether there was clear and convincing proof that the subject hospital patient had made a "firm and settled commitment, while competent," to decline life-sustaining [*11]medical assistance])[FN1]. The majority's inability to cite any apposite case supporting that flawed premise is telling. Its adoption of a legal standard altogether foreign to this context is as unreasoned as it is sure to sow confusion in the lower courts.
On the merits, with respect to the agency's claimed failure to adequately accommodate father's language needs, the majority seems to reach the conclusion that, as a matter of law, the agency's efforts were lacking because they failed to provide an interpreter at visitation and failed to communicate with father in his preferred language. While the record does not reveal why the initial communications with father were made in Mandarin, instead of his preferred language of Fuzhou, it does indicate that neither the agency nor the Mandarin interpreter perceived that father had any difficulties or deficits in understanding the language. To the contrary, the testimony was that he was able to comprehend the proceedings and consistently provided "logical answers" in Mandarin. Father himself confirmed that he was of "average" fluency in the language. It is therefore unsurprising that at oral argument, father repeatedly confirmed that his claim on appeal does not rest upon the agency's provision of Mandarin interpretation. In any event, the record reveals that the agency and father communicated adequately and effectively via the Mandarin interpreter that the agency provided.
Significantly, our review of the agency's diligent efforts in this regard is limited to the period prior to the filing of the petition in August 2017. The child had just turned three years old at that time, and, as noted above, had been diagnosed with special needs, including developmental delays. The testimony at the fact-finding hearing was that the child was nonverbal for the first two of those years and was "[l]imited in verbal speech" for the third. Stated simply, the language barrier was not an obstacle to reunification at the time the petition was filed. Rather, Family Court confirmed that it was the infrequent and inconsistent nature of the visitation, more than the child's placement in an English/Spanish-speaking household, that "caused a strain in the bonding process." The agency facilitated visitation with the child, communicated with father through an interpreter over the phone in a language he understood and provided him with feedback regarding his interaction with the child in their team conferences. They also referred him to a parenting class in Mandarin and to dyadic therapy through a Fuzhou interpreter. Under the circumstances, there is record support for the affirmed finding that the agency satisfied its burden.
The primary barriers to reunification actually identified by the agency were father's failure to engage in regular visitation and the failure to appreciate the nature of mother's mental illness, as well as its impact on her ability to safely care for the child. In addressing these issues, the agency developed a service plan, facilitated visitation with the child and provided father with transportation assistance in the form of MetroCards. The agency also accommodated father's work schedule, ultimately reducing visitation to once or twice a month at his request, while advising him of the need for more frequent visitation in order to establish a bond with the child. Nonetheless, "[m]ost of the time," father left his visits with the child "[a]bout half an hour" early. Finally, the agency encouraged father to attend mother's therapy sessions in order to better understand her mental illness. The reviewing courts with fact-finding power found that the agency satisfied the diligent efforts standard. There is support in the record for this determination and it is not our role to determine whether the agency could have done more.
Notably, the majority engages in its own fact-finding by depicting father's "economic circumstances" and the "low-wage" nature of his employment as factors identified by the agency as impacting his failure to engage in consistent visitation (see majority op at 20-21). As stated above, the agency and the courts below certainly identified the lack of consistent visitation between father and child as a significant obstacle, but [*12]neither court considered father's economic status a factor in analyzing the agency's diligent efforts. To the contrary, Family Court specifically observed that "money—providing financial support and stable housing was not the issue in this case." The majority's disregard of this affirmed factual finding—under the guise of answering what the majority insists is a "question of law" (majority op at 17)—is patently improper (see NY Const, art VI, § 3 [a] [with narrow irrelevant exceptions, "(t)he jurisdiction of the court of appeals shall be limited to the review of questions of law"]).
The majority also portrays the Family Court as having accepted "minimal" efforts by the agency in satisfaction of the diligent efforts standard by quoting extensively from the court's oral decision (see majority op at 10-11, 22-23). The court's subsequent written opinion, however, clarified that "the agency proved [the permanent neglect] cause of action and met their burden of proof to show it made diligent efforts," and that "the agency's efforts met the minimum statutory requirement that the efforts be reasonable." Although clearly Family Court expressed that it would have liked the agency to do more, it did, in fact, apply the correct legal standard. What comes through in Family Court's oral decision is the court's conclusion that the agency was making reasonable efforts and that father "failed to respond accordingly." In other words, the agency's efforts made no impact on father's insight into either mother's mental illness or the need for more consistent visitation in order to bond with the child. I agree with both the application of the diligent efforts standard by the courts' below, and with the determination that it is in the best interests of this child to be freed for adoption. Therefore, I would affirm the Appellate Division order.
Finally, it cannot be disputed that the current situation, in which father and child do not speak the same language, is regrettable. It may even be indicative of deeper systemic problems in both the agency's handling of foster care placements and the time it takes for cases such as this to wend their way through the Family Courts. But the present reality is that KYZ has now been in the foster care system for more than 11 years. More than a year ago, the Appellate Division noted that KYZ "was living in a loving foster home, where his extensive special needs were being met, and his foster mother wanted to adopt him" (228 AD3d at 562). Before this Court, the Attorney for the Child, in a brief supporting affirmance, notes that the child is "awaiting adoption" and that "Family Court has been holding 'freed child' permanency hearings." Now the entire process is undone. Whatever else the majority hopes to achieve, the result reached today will cause further delay and continued instability in this child's life.
Order reversed, without costs, and petition dismissed. Opinion by Judge Rivera. Chief Judge Wilson and Judges Troutman and Halligan concur. Judge Cannataro dissents and votes to affirm in an opinion, in which Judges Garcia and Singas concur.
Decided October 21, 2025

Footnotes

Footnote 1: Fuzhou is a dialect of the Fujian province in Southeast China (see Cathryn Donohue, The Interaction of Tones and Vowels in Fuzhou, Berkeley Linguistics Society, 97 [2007]). The dialects spoken in urban and rural areas of Fujian are "quite different," and "accents may even vary in different regions within the city of Fuzhou" (see Shuxiang You, Yanrong Du, and Qingyi Chen, Production of Mandarin and Fuzhou lexical tones in six- to seven-year-old Mandarin-Fuzhou bilingual children, 71 Acta Linguistica Academia 309, 317 [2024]). There is a sizable Fuzhounese population in the City, where, according to a 2011 article, "[t]he major Fuzhounese associations . . . claim between 300,000 to 500,000 Fuzhounese . . . have come to and through New York City since the 1980s" (Kenneth J. Guest, From Mott Street to East Broadway: Fuzhounese Immigrants and the Revitalization of New York's Chinatown, 7 Journal of Chinese Overseas 24, 29 [2011]). In 2011, "Fuzhounese represent[ed] the majority of new Chinese immigrants to New York City and ha[d] . . . surpassed the total Cantonese population in Manhattan's Chinatown and Brooklyn's Chinese community" (id.).

Footnote 2: Mandarin is distinct from Fuzhou in vocabulary, tonal characteristics, and phonetics. For example, Fuzhou has seven tones, while Mandarin has four (see You et al., Production of Mandarin and Fuzhou lexical tones in six- to seven-year-old Mandarin-Fuzhou bilingual children at 310). The languages have "different tonal inventories, with distinct pitch patterns and tonal contrasts" (id. at 316), and they are not mutually intelligible (see Yizhe Jiang, Having dumplings with a fork: language use and ideologies of a Fuzhounese-American youth, Journal of Multilingual and Multicultural Development 1, 3 [2024]).

Footnote 3: After the agency filed its termination petition and during the two years leading up to the hearing, father was able to work exclusively in the City.

Footnote 4: Dyadic therapy focuses on a child's relationship with a parent and is "based on a theoretical understanding of attachment and intersubjective relationships; and the impact of developmental trauma" (Dyadic Developmental Psychotherapy, https://ddpnetwork.org/about-ddp/dyadic-developmental-psychotherapy/ [accessed Sep. 19, 2025]). A child and parent work together, with the goal that "[t]he child gains relationship experience which helps [them] to grow and heal emotionally. Family members develop healthy patterns of relating and communicating" (id.).

Footnote 5: Termination of mother's parental rights is not at issue on this appeal.

Footnote 6: Father did not preserve, and he does not now raise, a claim that the agency's conduct violated a New York or federal antidiscrimination law or regulation. We therefore limit our analysis to whether the agency met its burden under Social Services Law § 384-b.

Footnote 7: Contrary to the Appellate Division's conclusion, the record does not support that father refused to learn English, as there is no evidence that the agency referred father to English language instruction or otherwise helped him access relevant learning resources. Father does not challenge the Appellate Division's determination on this issue as an inappropriate factor in assessing the agency's efforts, and we therefore have no occasion to opine on it.

Footnote 1: A look at the language replaced by the ellipsis in the passage quoted from Westchester County Med. Ctr. reveals the lengths to which the majority must go in order to transform its factual review into a question of law. The full quotation is "[n]othing less than unequivocal proof will suffice when the decision to terminate life supports is at issue" (majority op at 22, citing Westchester County Med. Ctr., 72 NY2d at 529 [omitted language italicized]).